[Civ. No. 69838. Second Dist., Div. Four. June 29, 1984.]

FEMINIST WOMEN'S HEALTH CENTER, INC., et al., Plaintiffs and Appellants, v.
ROBERT H. PHILIBOSIAN, as District Attorney, etc., et al., Defendants and Respondents;
CATHOLIC LEAGUE, SOUTHERN CALIFORNIA CHAPTER, et al., Interveners and Respondents.

COUNSEL

Fred Okrand, Carol Sobel, Eve Triffo and Gilbert Gaynor for Plaintiffs and Appellants.

De Witt W. Clinton, County Counsel, Robert C. Lynch, Assistant Chief Deputy County Counsel, and John McCauley, Deputy County Counsel, for Defendants and Respondents.

Paul L. Freese for Interveners and Respondents.

OPINION

WOODS, P. J.—Feminist Women's Health Center appeals from summary adjudication of issues granted in favor of respondents, Los Angeles County District Attorney and Board of Supervisors, and interveners/respondents, the Catholic League of Southern California. Appellants sought to enjoin the district attorney from disposing of 16,500 fetuses in a private cemetery where the Catholic League planned a religious ceremony.

This appeal requires us to determine whether the district attorney may constitutionally proceed to bury 16,500 fetuses in a private cemetery that

has donated the space, after he is aware that the cemetery has independently contracted with a religious organization to hold a religious burial service and mark the burial site with a memorial plaque. We conclude that he may not and, therefore, reverse the judgment.

Respondent district attorney was contacted by a container company in February of 1982 when approximately 16,500 fetuses and laboratory records were found in a repossessed container at the Woodland Hills home of Malvin Weisberg, the owner of a defunct pathology laboratory in Santa Monica. Weisberg had contracts with various physicians, clinics and hospitals which provided that after preparing pathology reports on the embryonic and fetal tissues sent to him, he would dispose of the tissue in accordance with state law. State law requires such tissue to be interred or incinerated. (Health & Saf. Code, §§ 7054.3, 25957.) Weisberg stored the tissue properly but, apparently due to his financial difficulties, he did not dispose of it.

The district attorney placed an evidentiary hold on the fetuses and laboratory records and coordinated several county agencies to examine the fetuses to determine whether they constituted evidence of criminal conduct. One hundred and fifty fetuses were found to be of greater than 20-weeks' gestation. At that time, Health and Safety Code section 25953 prohibited abortions of fetuses after 20-weeks' gestation.

The district attorney requested an opinion from the Attorney General as to the constitutionality of the 20-week ban. In April of 1982, the Attorney General responded with an opinion that it was constitutionally enforceable except as to abortions of nonviable fetuses and when necessary to preserve the mother's health or life. (65 Ops.Cal.Atty.Gen. 261, 267 (1982).) The district attorney concluded that while only the greater than 20-week fetuses had primary evidentiary value, a defendant in one of the proposed prosecutions might claim that the remaining younger-than-20-week fetuses were of evidentiary value to him. Consequently, the district attorney preferred burial in cement vaults so that the evidence could be preserved and disinterred if necessary.

Meanwhile, various public officials, politicians and organizations became involved in the disposition of the fetal tissue.

In March 1982, the Board of Supervisors, after a motion by Michael Antonovich, instructed a Dr. Joseph Wood to perform "autopsies" on 13 of the fetuses. Dr. Wood is a member of the California Pro-Life Medical Association. Dr. Wood provided that organization with unauthorized pho-

tographs of 42 "mangled" fetuses. The organization displayed some of these photographs at a news conference at the end of May, which was sponsored by two county supervisors and two state senators. The pictures were displayed on a large board entitled "American Holocaust."

State Senator Alex Garcia tried to claim the "bodies for the purpose of giving a proper decent burial and possibly some kind of memorial."

On May 5, 1982, President Reagan wrote Dr. Dreisbach, the Secretary of the California Pro-Life Medical Association, congratulating the organization's decision "to hold a memorial service for these children."

A motion proposed by County Supervisor Michael Antonovich was approved May 18, 1982. It provided that the district attorney be requested to release the less than 20-week fetuses and to request the county counsel's opinion as to who would have the right to possess them.

The county counsel replied on May 28, 1983, that the district attorney was entitled to possession of the fetuses as long as necessary to carry out his duties and that upon completion of these duties, the district attorney had discretion to dispose of them by either interment or incineration.

On April 21, 1982, Robert White, Director of County Health Services, wrote a memorandum to "Each Supervisor," describing a meeting of representatives of various county agencies involved with the fetuses. In pertinent part, it stated: "The District Attorney has indicated his intention to release the fetuses, probably within two weeks, to the custody of the Right to Life organization's representative. . . . [¶] . . . [¶] Pierce Brothers Mortuary has indicated their organization would provide the service of interment of the specimens into a burial plot at no charge to the County. The only compensation mentioned is some equitable recognition for providing this service." Copies of the memorandum were sent to the chief administrative officer, county counsel, the executive officer of the board of supervisors and the district attorney.

At the end of May, the Los Angeles Herald Examiner reported that a spokesperson for the district attorney had confirmed that the county counsel opinion on the release of the fetuses appeared to remove any obstacle to releasing the tissue to a group wishing to hold a religious service.

Meanwhile, in early May, appellant Feminist Women's Health Center requested the district attorney to release the pregnancy tissue in order to dispose of it according to law. A group called Atheists United made the

same request. Neither request was granted. "Upon learning of indications that the District Attorney was preparing to release the aborted tissue . . . to anti-choice organizations which wished to dramatize their opposition to legalized abortion by holding a religious burial service for the aborted tissue," appellants filed as taxpayers a first amended complaint for injunctive and declaratory relief in Los Angeles Superior Court on June 17, 1982. They argued that the district attorney's action violated the federal and state constitutionally guaranteed separation of church and state.[1]

On June 29, 1982, the court issued a preliminary injunction preventing the district attorney from releasing any of the fetal tissue pending a trial on the merits.

In June or July of 1982, the Los Angeles Health Department apparently called a number of cemeteries to find one that would inter the tissue free of charge. Valhalla Memorial Park in Burbank agreed to inter the fetuses.

On September 30, 1982, the district attorney asked for a modification of the preliminary injunction to permit him to store and bury the less than 20-week tissue in concrete vaults at Valhalla Memorial Park in Burbank. The district attorney wanted to "lawfully inter" as well as "preserve this evidence for the defense of a possible prosecution."

The district attorney's intention to transfer the tissue to Valhalla was reported in the Los Angeles Times. In late September of 1982, the Catholic League of Southern California and its president Paul Freese, interveners and respondents herein, executed a contract with Valhalla permitting the league to hold a religious burial service as the tissue was "stored" and to place a memorial plaque at the site.[2]

The Catholic League and Paul Freese sought to intervene in the action on October 7, 1982. Leave to intervene was granted on October 14, 1982.

---

[1] Appellants also sought to enjoin the release of the fetal examination reports as autopsies because the records would contain private medical information and the identity of women who had undergone induced abortions is protected by Government Code section 6254, subdivision (c).

The complaint further sought to enjoin the district attorney from investigating the physicians who performed abortions and used the Weisberg laboratory. Appellants claimed the Attorney General incorrectly interpreted Health and Safety Code section 25953 and that the investigation for alleged criminal activity chilled the exercise of their fundamental right to chose whether or not to procreate.

[2] The record does not reveal the wording of the memorial plaque but one of the intervener's declarations stated that a previous such plaque read: "Pray that a mother's love be strengthened that she does not turn against the child of her womb."

Appellants' motion to temporarily enjoin transfer of the tissue to Valhalla was granted on November 3, 1982. The interveners noticed an appeal from the temporary restraining order on November 12, 1982. The cause was then transferred to the trial department since the appeal negated the court's jurisdiction. The court ruled that the temporary restraining order would remain in effect pending a ruling on appeal.

In early December, both appellants and respondents moved for summary judgment or in the alternative for summary adjudication of the issues. After a hearing on both motions, the court decreed that: The contract between Valhalla and the Catholic League was made without any state participation or expenditure of public funds, and, therefore, the district attorney's "proposal to inter the fetal remains which are the subject of this case at Valhalla Memorial Park, where interveners intend to hold a religious ceremony over it, without organizing, holding or otherwise participating in that religious ceremony is not a violation of the First and Fourteenth Amendments to the United States Constitution or article I, section 4 and article IVI [*sic*], section 5 of the California Constitution. Accordingly, defendants are expressly permitted to dispose of the fetal remains in a manner consistent with this order."[3]

The court granted a 20-day stay of its order in accordance with the judgment. Appellants promptly petitioned for a writ of mandamus and temporary stay order. The petition was denied, but the order permitting the respondents to bury the fetal tissue was stayed until March 17. Appellants then petitioned the California Supreme Court for extraordinary relief. That court ruled that pending a final determination of any timely appeal, the stay of the order permitting burial was to remain in effect.

Appellants then appealed from the parts of the judgment declaring that burial at Valhalla was not constitutionally prohibited.

Appellants argue that the district attorney's burying the aborted tissue at Valhalla where the event will be commemorated by a religious ceremony and memorial plaque: (1) is unconstitutional because the state may not do indirectly that which it may not do directly, i.e., sponsor a religious ceremony; (2) violates the separation of church and state guaranteed by the

---

[3]The judgment also provided that: (1) The prohibition of Health and Safety Code section 25953 against abortion after the twentieth week of pregnancy is unconstitutional; (2) the district attorney is permanently enjoined from prosecuting any person based on the length of gestation of a pregnancy when terminated; and (3) the district attorney is permanently enjoined from divulging the names of the women or doctors involved in the abortions which produced the fetal tissue. Respondents and interveners did not appeal.

federal and state Constitutions; specifically, the establishment clause of both Constitutions and article XVI, section 5 of the California Constitution; (3) impermissibly undermines fundamental rights of privacy and procreative choice.

Respondents argue they had a mandatory duty to preserve potential evidence, that they now have a duty to promptly dispose of the tissue as required by law, and that it is within their discretion to choose between lawful alternative methods of disposal. They deny that the district attorney ever treated the tissue as human beings and claim there is an insufficient relationship between the district attorney and the Catholic League to constitute official support of the Catholic League's activities. Respondents argue their action has a secular purpose because its primary effect is to lawfully dispose of the remains, not to aid religion. Respondents further argue that their actions do not violate any provision of the California Constitution. Finally, respondents contend that appellants have no standing to assert the privacy rights of women not a party to this action, and that, in any event, no violation of privacy or right of procreative choice is threatened.

Interveners generally echo respondents' arguments but they also maintain that "the Constitution does not prohibit regard for the infant in the womb," and, therefore, "the question of life" is not a religious issue.

I

In their argument that the state cannot do indirectly what it is forbidden to do directly, appellants creatively use state action analysis drawn from equal protection cases to demonstrate impermissible state action in this case. We decline to follow this analysis because state action, in the context argued, is a tool for prohibiting *private conduct* by finding a sufficient relationship between the private conduct and the state. (*Burton* v. *Wilmington Pkg. Auth.* (1961) 365 U.S. 715 [6 L.Ed.2d 45, 81 S.Ct. 856].) The Catholic League's private conduct consisting of speech or the holding of religious services is protected by the Constitution of the United States and the Constitution of California. The public conduct which appellants seek to enjoin is clearly state action. The issue before us is whether the state action is unconstitutional.

II

The California Constitution prohibits the Legislature from making law "respecting an establishment of religion." The California establishment clause also states that the rights it guarantees are not dependent on those

guaranteed by the United States Constitution. (Cal. Const., art. I, §§ 4, 24.)

■ Some rights guaranteed by the California Constitution are not guaranteed by the United States Constitution. (Cal. Const., art. I, § 24; *People v. Brisendine* (1975) 13 Cal.3d 528, 548-550 [119 Cal.Rptr. 315, 531 P.2d 1099].) With certain exceptions not here relevant, California courts alone determine the rights guaranteed by the California Constitution so long as those rights extend equal or greater protection to those guaranteed by the federal Constitution under totally similar provisions of the Bill of Rights. (*Mandel v. Hodges* (1976) 54 Cal.App.3d 596, 616 [127 Cal.Rptr. 244, 90 A.L.R.3d 728].) Therefore, we examine the constitutionality of the proposed action on independent state grounds. However, since only three California cases have considered our state's establishment clause,[4] we also consult principles of federal cases as they seem compelling guides to uncharted state grounds.

We note two factors at the outset. First, most of the federal cases analyzing the establishment clause test statutes to determine if they violate the clause. Here, there is no legislative action, instead we are asked to consider whether the district attorney's executive action violates the establishment clause.

■ The district attorney has discretion to initiate and conduct prosecutions. (Gov. Code, § 26500; *Taliaferro v. Locke* (1960) 182 Cal.App.2d 752 [6 Cal.Rptr. 813].) Since the fetuses came into his possession as potential evidence in a criminal investigation, the disposal of the evidence is his responsibility. His executive action in the proposed disposal is an outgrowth of the legislative act which conferred prosecutorial discretion upon him.

An executive action taken in the exercise of power vested in the executive by legislative enactments can be prohibited by the establishment clause. (*Mandel v. Hodges, supra,* 54 Cal.App.3d at p. 611.) Consequently, we apply the principles of case law which were formulated in the analysis of statutes even though we are dealing with an executive action.

Secondly, the case before us is factually distinguishable from all precedents. In our effort to apply existing principles to this unique situation, we will treat the classic methods for determining establishment clause violations

---

[4]*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792 [150 Cal.Rptr. 867, 587 P.2d 663]; *Johnson* v. *Huntington Beach Union High Sch. Dist.* (1977) 68 Cal.App.3d 1 [137 Cal.Rptr. 43]; *Mandel* v. *Hodges, supra,* 54 Cal.App.3d 596.

as "touchstone[s] with which to identify instances where the objectives of the establishment clause have been compromised. [Citation.]" (*Johnson* v. *Huntington Beach Union High Sch. Dist., supra,* 68 Cal.App.3d at p. 11.) ▮ The establishment clause was written to protect against " 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' " (*Meek* v. *Pittenger* (1975) 421 U.S. 349, 358-359 [44 L.Ed.2d 217, 228, 95 S.Ct. 1753], quoting *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 668 [25 L.Ed.2d 697, 701, 90 S.Ct. 1409].)

In 1971, the United States Supreme Court enunciated three tests for determining whether a given law complied with the establishment clause. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion [citation]; finally, the statute must not foster 'an excessive government entanglement with religion.' [Citation.]" (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755, 91 S.Ct. 2105].) These three tests "are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions . . . that discriminate *among* religions." (*Larson* v. *Valente* (1982) 456 U.S. 228, 252 [72 L.Ed.2d 33, 52-53, 102 S.Ct. 1673].) When the law at issue grants a denominational preference "we treat the law as suspect and . . . we apply strict scrutiny in adjudging its constitutionality." (*Larson* v. *Valente, supra,* at p. 246 [72 L.Ed.2d at p. 49].)

Appellants argue that the district attorney's action is unconstitutional under either the *Lemon* or *Larson* test, but that the strict scrutiny test is applicable here because the government action involved demonstrates official support for the religious views of a particular group. "[N]ot all religions hold that aborted fetuses are 'persons' who must be buried, and equate abortion with homicide. But the Roman Catholic religion does, and the interveners are Catholics who adhere to those beliefs." The district attorney argues that his act is nondenominational because any other denomination is free to act with respect to the burial. Interveners claim that the "record does not justify any inference that the question about life is only a sectarian concern."

The United States Supreme Court has recently expressed its "unwillingness to be confined to any single test or criterion in this sensitive area. [Citations.]" (*Lynch* v. *Donnelly* (1984) — U.S. —, — [79 L.Ed.2d 604, 613, 104 S.Ct. 1355].)[5] We concur in the conclusion that no one test is defin-

---

[5]Nonetheless, Justice Brennan's dissent in *Lynch* v. *Donnelly, supra,* notes that only in *Marsh* v. *Chambers* (1983) 463 U.S. 783 [77 L.Ed.2d 1019, 103 S.Ct. 3330], was neither the *Lemon* analysis nor strict scrutiny applied. (*Lynch* v. *Donnelly, supra,* at p. —, fn. 2 [79 L.Ed.2d at pp. 624-625] (dis. opn. of Brennan, J.).)

itive. However, in the case before us, applying either the *Lemon* or the *Larson* tests to the California establishment clause we conclude that the act of burying at Valhalla in the context described violates religious guarantees of the California Constitution.

■ The strict scrutiny test is applied to an establishment clause issue when government activity shows a preference for one religion over another. (*Larson* v. *Valente, supra,* 456 U.S. at p. 246 [72 L.Ed.2d at pp. 48-49].) It is appropriate here because the Catholic League represents a particular religious view and the district attorney's purported action would, in effect, sponsor and approve that view.

In the application to intervene, Paul Freese, President of the Catholic League, stated: "Together with many other citizens having religious convictions, I believe, based both on religious and scientific information, that a fetus is an infant, a human and spiritual being, and my brother or sister in Christ. Catholics and others sharing spiritual perceptions of life have constitutional rights to assemble and to express views, religious or otherwise, about the spirituality of life through public prayer or other peaceful manifestations of belief and to convey thereby their opinion about the tragic defamation of life and soul as perceived in the occurrences and circumstances made known by the pleadings herein."

The reason alleged for intervention was because "it is necessary that representatives of religious viewpoints be allowed to intervene to protect their constitutional rights against infringement by a hostile philosophic group."

The complaint in intervention states that the Catholic League is a California corporation "specifically designed to assist Catholics and others in the protection of their civil rights and religious freedom of Americans." The Catholic League alleged that the purpose of Feminist Women's lawsuit was to prevent the district attorney "from giving proper and customary deference to persons who have a legitimate interest under the law in recovering possession of the bodies or in giving religious attention to what are regarded by [the Catholic League] as creatures of God having eternal destinies."

It is clear from the record that the Catholic League is a religious organization which regards a fetus as a human being and abortion as murder. While this specific belief may well cross sectarian lines, it is a belief not universally held. ■ Consequently, any state action showing a preference for this belief will be strictly scrutinized and must be invalidated unless

it is justified by a compelling governmental interest with which "it is closely fitted to further [that] interest." (*Larson* v. *Valente, supra,* 456 U.S. at pp. 248-249 [72 L.Ed.2d at p. 50].)

 Originally, the district attorney maintained that his primary interest in interring the fetuses at Valhalla was so they could be disinterred if needed for evidence. The state's need to preserve the fetuses as evidence no longer exists. The court below permanently enjoined the district attorney from criminally prosecuting anyone under any statute based on the length of gestation of a pregnancy. That decision was not appealed.

In his brief to this court, the district attorney states he does not now intend to commence any criminal prosecution in connection with these fetuses. Therefore, the district attorney's only interest in regard to the fetuses is to dispose of them lawfully. Health and Safety Code sections 7054.3 and 25957 provide that fetal remains shall be promptly disposed of by interment or incineration.

The fetal remains of abortions performed at public medical facilities in Los Angeles County are incinerated without ceremony at county facilities or at private hospitals. The record reflects that although these fetuses are preserved in formaldehyde, they could still be disposed of in this manner. Thus, there is no compelling state interest to dispose of the fetuses in a private cemetery. The fact that Valhalla would dispose of the fetuses at no cost to the county is not sufficient compelling interest to justify the appearance of state sanction of a particular religious belief.

### III

 The same conclusion of unconstitutional behavior is reached through the three tests of *Lemon* v. *Kurtzman, supra,* 403 U.S. 602. We find no secular purpose in the proposed act; its primary effect enhances religion; and it creates excessive political entanglement with religion.

 The right to injunctive relief must be determined as of the date of an appellate court's decision. (*White* v. *Davis* (1975) 13 Cal.3d 757, 773, fn. 8 [120 Cal.Rptr. 94, 533 P.2d 222].) Therefore, the fact that the fetuses need no longer be preserved as evidence eliminates the secular purpose of interring them at Valhalla. Governmental purpose may be inferred from the act itself to contradict the government's avowed purpose. (*Stone* v. *Graham* (1980) 449 U.S. 39, 41 [66 L.Ed.2d 199, 202, 101 S.Ct. 192].)

We perceive the purpose test to be objective in nature. Here, in the context of earlier publicity stating the district attorney's intention to turn the fetuses over to a pro-life group for religious burial, the *appearance* of a religious purpose in interring the fetuses at Valhalla is sufficient to prohibit that action when no secular purpose exists for so doing and where other means exist which do not symbolically support a particular religious viewpoint. "[T]he very symbolism of conspicuous governmental aid to identifiably religious enterprise is regarded as an independent evil. Indeed . . . nothing short of a concern with such symbolism could distinguish those cases of aid to the religious enterprise which the Court has deemed impermissible from those which the Court has readily tolerated. Apart from the significance of symbols in establishing precedents for a more dangerous incursion, the fact of symbolic governmental identification with a religious activity must be understood to constitute a separate evil in a system that regards matters of religious concern as ultimately delegated to individual and community conscience." (Tribe, American Constitutional Law (1978) p. 868.) The state must not only maintain the reality of separation with the church; it must also maintain the appearance of such separation. (*Fox* v. *City of Los Angeles, supra,* 22 Cal.3d at p. 804 (conc. opn. of Bird, C.J.).)

No clear secular purpose exists for burial at Valhalla; under the *Lemon* test this is conclusive of the unconstitutionality of that act. (*Mandel* v. *Hodges, supra,* 54 Cal.App.3d at p. 613.) We, nevertheless, apply the other *Lemon* criteria.

In denying that the primary effect of this action is the enhancement of religion, respondents and interveners argue that any religious effect from the burial ceremony arises from the protected expression of the Catholic League and not from any government action. We disagree.

The Catholic League has a constitutionally protected right to express their view that the fetuses are murdered humans and to publicly mourn them. They do not have the right, however, to have the state's imprimature on that expression.

Either the public act of disposing of the fetuses with no government display of religiosity, or the private expression of protected ideas would be proper. The impropriety comes from proceeding with the public act when the private group's intent to use that public act to frame and support the private expression is widely known.

The state's delivery of the fetuses is the reason for the planned event. The League asserts in its brief: "It is precisely because there may be a national

audience for any speeches made at the memorial service that the Appellants seek judicial suppression of the event."

The primary effect of the district attorney's burying the fetuses at Valhalla would be to give symbolic support to the religious views of the Catholic League. Consequently, to do so would violate the establishment clause.

█ Excessive entanglement of the state with religion can result from administrative entanglement (*Lemon* v. *Kurtzman, supra,* 403 U.S. at pp. 624-625 [29 L.Ed.2d at p. 762] (conc. opn. of Douglas J.)), or from political entanglement (*Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 797-798 [37 L.Ed.2d 948, 976-977, 93 S.Ct. 2955]). The potential for political divisiveness based on differences in religious views is a factor in judging the constitutionality of state action. (*Committee for Public Education* v. *Nyquist, supra,* at pp. 797-798 [37 L.Ed.2d at pp. 976-977]; *Meek* v. *Pittenger, supra,* 421 U.S. at p. 372 [44 L.Ed.2d at pp. 235-236]; *Lynch* v. *Donnelly, supra,* — U.S. at p. — [79 L.Ed.2d at pp. 628-630] (dis. opn. of Brennan, J.).)

"The potential divisiveness of political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." (Zoetewey, *Excessive Entanglement: Development of a Guideline for Assessing Acceptable Church-State Relationships* (1976) 3 Pepperdine L.Rev. 279, 287, discussing *Lemon* v. *Kurtzman, supra,* 403 U.S. at p. 622 [29 L.Ed.2d at p. 761].)

█ The proposed burial at Valhalla does not present any administrative entanglement with religion since the district attorney plans to deliver the fetuses and leave. It does, however, cause political entanglement. The abortion issue is one of the most emotionally explosive issues in today's political firmament. The appearance of support by the state, of one side of this controversy over the other, is improper political entanglement. The act of indirectly turning the fetuses over to Valhalla for religious burial as murdered humans would vitiate the studied neutrality which is the state's constitutional course. The proposed action would aggravate an already volatile religious issue.

Under the federal Constitution, no case has held that political entanglement alone will support a finding of unconstitutionality. The potential political divisiveness of the district attorney's proposed action is, however, in the unique situation before us, an important factor in reaching that determination under the California Constitution.

In conclusion we find the proposed burial at Valhalla would violate the establishment clause of the California Constitution.

## IV

██ The "no preference of religion clause" of the California Constitution provides additional grounds for a finding of unconstitutionality. Article I, section 4 of the California Constitution states: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion." The California Supreme Court has interpreted this section as being broader than the federal guarantee because preference is forbidden even when there is no discrimination. (*Fox* v. *City of Los Angeles, supra,* 22 Cal.3d at p. 796.) Referring to this clause, the Attorney General's office has said: "It would be difficult to imagine a more sweeping statement of the principle of government impartiality in the field of religion." (25 Ops.Cal.Atty.Gen. 316, 319 (1955).)

In *Fox, supra,* the California Supreme Court held that a preference was unconstitutionally shown to one religion by the illumination of a huge cross on the Los Angeles City Hall at Christmas and Easter. The concurring opinion noted that even though the city's stated purpose was to promote "'peace and good fellowship toward all mankind,'" in fact a preference had occurred. "*Whatever the city's subjective purpose,* an impermissible religious preference *has* objectively resulted." (*Fox* v. *City of Los Angeles, supra,* 22 Cal.3d at p. 804 (conc. opn. of Bird, C. J.).) We find this principle particularly apt in the case before us. Whatever the district attorney's motive, a preference will be objectively demonstrated if the fetuses are delivered to Valhalla in these circumstances. As the concurring opinion observed in *Fox:* "We must never forget that the religious freedom of every person is threatened whenever government associates its powers with one particular religious tradition. The threat today may seem small, but the breach in principle is large." (*Fox* v. *City of Los Angeles, supra,* at p. 805.)

We find that the district attorney's proposed action would express an unconstitutional preference for the views of the Catholic League.

## V

██ Yet another basis for holding the proposed act unconstitutional under the California Constitution is article XVI, section 5, which forbids official aid to any "religious sect, church, creed, or sectarian purpose, . . ." This has been interpreted as banning "any official involvement, whatever its

form, which has the direct, immediate and substantial effect of promoting religious purposes." (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 605, fn. 12 [116 Cal.Rptr. 361, 526 P.2d 513].) Article XVI, section 5 "was intended to insure the separation of church and state and to guarantee that the power, authority and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes." (*Id.*, at p. 604.) The prohibited aid under this section includes aid "in the intangible form of prestige and power." (*Fox* v. *City of Los Angeles, supra,* 22 Cal.3d at p. 802 (conc. opn. of Bird, C. J.).)

We perceive that the intended burial ceremony will enlist the prestige and power of the state. This is constitutionally forbidden.

For all the reasons stated herein, it would be equally improper for the district attorney to release the tissue to any of the parties to this action.

## VI

Given the conclusions reached as to the unconstitutionality of the proposed action, we need not and do not consider appellants' argument that the proposed method of burial violates the privacy rights of the parents of the fetuses and undermines procreative choice.

The judgment is reversed. The cause is remanded to the trial court which is directed to enter a declaratory judgment consistent with this opinion.

Kingsley, J., and McClosky, J., concurred.

A petition for a rehearing was denied July 17, 1984, and the petitions of all respondents for a hearing by the Supreme Court were denied September 20, 1984. Lucas, J., was of the opinion that the petition should be granted.