TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | No. 96-507 |
| | : | |
| of | : | September 13, 1996 |
| | : | |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE PHIL HAWKINS, MEMBER OF THE CALIFORNIA STATE ASSEMBLY, has requested an opinion on the following question:

If a school district sells commercial advertising space on a fence surrounding its high school baseball field, may it refuse to accept an advertisement which contains the Ten Commandments and identifies the advertising party?

CONCLUSION

If a school district sells commercial advertising space on a fence surrounding its high school baseball field, it may not refuse to accept an otherwise appropriate advertisement which contains the Ten Commandments and clearly identifies the advertising party.

ANALYSIS

A school district is selling commercial advertising space on the fence surrounding its high school baseball field to generate funds for its athletic programs. A business owner offers to purchase space for a sign which advertises his business and incorporates the Ten Commandments. The district's policy is to permit the display of signs containing purely "commercial speech," involving the offering of goods or services. Advertisements for goods or services are prohibited if

they contain any religious teachings or doctrines. The advertisement containing the Ten Commandments was therefore disallowed. Does the district's action comport with the United States and California Constitutions? We conclude that it does not.

A school district may undoubtedly refuse to permit any advertising on its baseball field fence. That is the typical situation today for high schools located throughout the state. Once a district allows a certain type of speech to be displayed, however, First Amendment principles must be examined.

The First Amendment of the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech ... ."[1] This constitutional safeguard is made applicable to the states through the Fourteenth Amendment. (*Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 215.) Before determining whether the school district may reject the advertisement in question, we stop to consider whether, in light of the separation of church and state principle of the First Amendment, the school district may *accept* the advertisement.

Preliminary Constitutional Considerations

1. The Establishment Clause of the United States Constitution

The school district has in effect created an advertising opportunity for private enterprise that is akin to the sale of advertising space in programs distributed at school-sponsored athletic events. Businesses offering a wide variety of products and services might find it advantageous to use the fence or wall surrounding a high school baseball field or other sports facility to engage in advertising. Revenue generated from this advertising space would be used to support school athletic programs. Would it offend the Establishment Clause of the First Amendment if, in this context, the school district were to accept business advertisements containing religious material?

The "[U.S. Supreme] Court's Establishment Clause cases ... hold that a policy will not offend the Establishment Clause if it can pass a three-pronged test: `First, the [governmental policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ... ; finally, the [policy] must not foster "an excessive

---

[1] Similar to the federal Constitution, subdivision (a) of section 2 of article I of the California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." While the California Constitution has been construed as being more protective of First Amendment rights than the federal Constitution (*Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 519; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 903, 907-910; *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658; *Women's Internat. League Etc. Freedom* v. *City of Fresno* (1986) 186 Cal.App.3d 30, 37-38); *Savage* v. *Trammell Crow Co., Inc.* (1990) 223 Cal.App.3d 1562, 1572-1573; see also *U.C. Nuclear Weapons Lab Conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1164-1165; 75 Ops.Cal.Atty.Gen. 232, 238 (1992)), the "power to impose restrictions on [expressive] activity is nonetheless measured by federal constitutional standards."

government entanglement with religion."'" (*Widmar* v. *Vincent* (1981) 454 U.S. 263, 271, quoting *Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613; see also, 76 Ops.Cal.Atty.Gen. 52, 55-59, (1993).) Here, it is evident that the advertising forum serves a secular purpose by generating additional revenues for school activities. The principal or primary effect of the forum is to promote local business enterprise generally, not to advance or inhibit religion. It is possible that a religious group might derive some benefit from a religious message in the advertising, but "a religious organization's enjoyment of merely `incidental' benefits does not violate the prohibition against the `primary advancement' of religion." (*Widmar* v. *Vincent, supra*, 454 U.S. 263, 273, quoting *Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 771.) The advertising space is available to commercial advertisers generally, all of whom must pay for the privilege of having their respective signs posted. The appearance of the advertiser's name on the sign would serve to dispel any notion that the school district is endorsing the religious message contained in the ad. At least in the absence of empirical evidence that religious messages will dominate the advertising forum, we may conclude that the advancement of religion would not be the forum's primary effect. (See *Widmar* v. *Vincent, supra*, 454 U.S. 263, 274-275.) Finally, as the religious material is merely incorporated into the advertisement by a business and is not presented by a religious organization, it is difficult to argue that the forum involves any government entanglement with religion, let alone one that is excessive. There is no subsidization of religious activity and no church sponsor, just an arm's length transaction between the district and a private business entity whose advertising happens to contain a religious message. The courts have repeatedly concluded that such arm's length transactions do not involve excessive entanglement with religion. (76 Ops.Cal.Atty.Gen. 52, 59, *supra*.) We therefore conclude that the district may accept the advertisement in question without violating the Establishment Clause of the First Amendment.

2. The California Constitution

Article I, section 4 of the California Constitution provides that: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed .... The Legislature shall make no law respecting an establishment of religion." California courts have not held that Art. I, § 4 is broader than the Establishment Clause of the First Amendment simply because of the additional language regarding "preference." (See *Sands* v. *Morongo Unified School District* (1991) 53 Cal.3d 863; *Fox* v. *City of Los Angeles*, 22 Cal.3d 792, 796 (1978); *Feminist's Womens' Health Center* v. *Philibosian*, 157 Cal.App.3d 1076, 1092 (1984).) Therefore, as indicated above, we see no basis for an argument that the advertising program would favor or prefer any individual religion or religion as a whole.

The California Constitution also contains another provision restricting governmental involvement in religion. Article XVI, section 5 provides in part that:

"Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university,

hospital, or other institution controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, county, town, or other municipal corporation for any religious, creed, church, or sectarian purpose whatever. ..."

This provision has been interpreted to "ban any official involvement, whatever its form, which has the direct, immediate, and substantial affect of promoting religious purposes." (*California Teachers' Association* v. *Riles*, (1981) 29 Cal.3d 794, 806.) However, it has never been interpreted to prohibit a religious institution from receiving indirect, remote, and incidental benefits from a statute which has a secular primary purpose. (*California Educational Facilities Authority* v. *Priest* (1974) 2 Cal.3d 593, 605.)

Here the benefit derived from advertising at the athletic facility does not necessarily inure to a religious institution and is, at most, an indirect, remote or incidental benefit for such an institution. We conclude that neither article I, section 4 nor article XVI, section 5 would prevent the district from accepting the paid advertisement in question for display on the fence surrounding the school athletic facility.

Having determined that neither the Establishment Clause nor any provision of the State Constitution stands as an impediment to the school district's acceptance of the advertisement in question, we now turn to the central issue of whether the district may nonetheless *reject* the advertisement because of its religious content. We begin this phase of our inquiry by identifying the nature of both the speech involved and the forum in which the advertising takes place.

Type of Speech Involved

The school district's policy is to allow only purely commercial speech to be placed on the baseball field fence. We recognize that the display of a religious doctrine, even though contained in an otherwise commercial advertisement, may have a sectarian purpose in addition to its secular purpose. However, we need not consider here whether any sectarian purpose informs the advertiser's decision to include the Ten Commandments. It is enough to note that many business owners find it important to convey the notion that they operate their respective businesses on the basis of certain religious/moral beliefs or principles.[2] Thus we do not view the mere presence of the Ten Commandments in the advertisement in question as removing the ad from the realm of commercial speech.[3] Commercial speech is protected by the First Amendment if it

---

[2]    One has only to take note of the ubiquitous Christian "fish" symbol in Yellow Page advertisements and elsewhere to see that this is true.

[3]    In *Board of Trustees of the State University of New York* v. *Fox* (1989) 492 U.S. 469, the Court considered a state university regulation which prohibited the operation of private commercial enterprises in student dormitories. The specific activity in question was the sale of Tupperware products in the context of presentations which involved some discussion of home economics. In finding the presentations to be commercial speech, the Court stated:

concerns lawful activity and is not misleading. (*44 Liquormart, Inc.* v. *Rhode Island* (1996) ___ U.S. ___, 134 L.Ed 2d 711, 723-726; *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York* (1980) 447 U.S. 557, 566.)[4] We assume both of those conditions to be the case here.

Type of Forum Involved

The district's ability to limit the subject matter of the speech depends in part on whether the fence constitutes a "public forum" for purposes of the First Amendment. In 75 Ops.Cal.Atty.Gen., *supra*, at 235-238, we concluded that only a limited area on school property required to be made a "civic center" under the Civic Center Act (Ed. Code, §§ 40040-40048; see *American Civil Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 208; *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 540; *Goodman* v. *Board of Education* (1941) 48 Cal.App.2d 731, 734-738) constitutes a "public forum" for First Amendment purposes. Other school property, such as a baseball field fence, would not constitute a public forum under our 1992 analysis. Our prior conclusion is well supported by a long line of federal and state cases holding that specified areas are not public forums. (See, e.g., *International Soc. for Krishna Consciousness, Inc.* v. *Lee* (1992) 505 U.S. 672 [airport terminal]; *U.S.* v. *Kokinda* (1990) 497 U.S. 720 [post office sidewalk]; *Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37 [school district's internal mail system]; *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [space for advertising on city buses]; *State of Tex.* v. *Knights of Ku Klux Klan* (5th Cir. 1995) 58 F.3d 1075 [space for advertising adopt-a-highway sponsor on highway sign]; *Planned Parenthood* v. *Clark County School Dist.* (9th Cir. 1991) 941 F.2d 817 [space for advertising in high school athletic event program]; *Clark* v. *Burleigh* (1992) 4 Cal.4th 474 [space for candidates' statements in voter's pamphlet]; *Women's Internat. League etc. Freedom* v. *City of Fresno*, *supra*, 186 Cal.App.3d 30 [space for advertising on city buses].)

---

"Including these home economics elements no more converted AFS presentations into educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech. ... We discuss this case, then, on the basis that commercial speech is at issue." (*Id*, at pp. 474-475.)

[4] If public property were not involved, the protection afforded the commercial speech at issue would have been determined in accordance with the following analysis:

"In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (*Ibid.*)

In *Cornelius* v. *NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 802-804, the court explained:

"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. [Citation.] Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. [Citation.] The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent. . . ."

"Not every instrumentality used for communication . . . is a traditional public forum or a public forum by designation. [Citation.] `[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' [Citation.] We will not find that a public forum has been created in the face of clear evidence of a contrary intent, [citation], nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity. [Citation.] In *Perry Education Assn.* we found that the School district's internal mail system was not a public forum. In contrast to the general access policy in *Widmar*, school board policy did not grant general access to the school mail system. The practice was to require permission from the individual school principal before access to the system to communicate with teachers was granted. Similarly, the evidence in *Lehman* v. *City of Shaker Heights*, 418 U.S. 298 (1974), revealed that the city intended to limit access to the advertising spaces on city transit buses. It had done so for 26 years, and its management contract required the managing company to exercise control over the subject matter of the displays. *Id.*, at 299-300. Additionally, the Court found that the city's use of the property as a commercial enterprise was inconsistent with an intent to designate the car cards as a public forum."

Here the baseball field fence is not intended to be used for indiscriminate expressive activity but rather solely for commercial advertisements permitted by the school district to generate revenues for its athletic programs. Hence it may be viewed as a "nonpublic forum" for First Amendment purposes.[5] The consequence of such determination is that the school district may

---

[5] In *Clark* v. *Burleigh*, *supra*, 4 Cal.4th at 483, footnote 9, the court explained the meaning of the term "nonpublic forum":

"Although it may be convenient shorthand, the phrase `nonpublic forum' is somewhat misleading. Property in this category is not `nonpublic' in the sense that it is privately owned; it remains at all times public property either owned or controlled by the government. Nor is the property a `forum' in the sense of a meeting place or medium for open discussion; on the contrary, it is precisely because it is not such a meeting place or medium that the government can lawfully close it to such discussion. In short, a `nonpublic forum' is simply public property that is not a public forum by tradition or design."

limit the content of the signs on the fence as long as the restrictions are "reasonable" and viewpoint neutral.  (See *Lamb's Chapel* v. *Center Moriches Union Free School Dist.* (1993) 508 U.S. 384, 392-393; *International Soc. For Krishna Consciousness, Inc.* v. *Lee, supra*, 505 U.S. at 683-685; *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc., supra*, 473 U.S. at 806; *Perry Ed. Assn.* v. *Perry Local Educators' Assn., supra*, 460 U.S. at 49; *Clark* v. *Burleigh, supra*, 4 Cal.4th at 483.)

Reasonableness and Viewpoint Neutrality

Given the existence of a nonpublic forum, i.e., the school district did not intend to create advertising space for indiscriminate use by the advertising public, we must determine whether the school district's rejection of advertising containing the Ten Commandments is reasonable and viewpoint neutral.  As stated in *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc., supra* 473 U.S. 788:

> "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."  (*Id.*, at p. 806.)

In several cases involving a nonpublic forum, the courts have found certain advertising to have been reasonably rejected by the public authority.  In *Planned Parenthood* v. *Clark County School Dist., supra*, 941 F.2d. 817, the court found that "the school district's policy of not publishing advertisements that are controversial, offensive to some groups of persons, that cause tension and anxiety between teachers and parents and between competing groups such as [Planned Parenthood] and pro-life forces' is a reasonable one."  (*Id.*, at pp. 829-830.)  Among the school's legitimate concerns in this regard were "the possible perception of sponsorship and endorsement" of one side of a controversial issue and the possibility of "being forced to open up school publications to organizations having views competing with those of Planned Parenthood" if it were to publish the proffered advertisement.  (*Id.*, at p. 830.)  The court noted that in *Perry Education Assn.* v. *Perry Local Educator's Ass'n, supra*, 460 U.S. 37, 52, the school district's policy of excluding a non-certified union from the school's internal mail facilities" prevented the system from becoming a battlefield for inter-union squabbles."  In *State of Texas* v. *Knights of the Ku Klux Klan, supra*, 58 F.3d 1075, 1079, the court determined that it was reasonable for the state to deny the KKK's application to adopt a particular highway as part of the state's Adopt-a-Highway Program, where the highway led to a recently desegregated housing project and the KKK had evidenced an intent to use the program for purposes of intimidation and as a means of inciting tension and possibly even violence.  And in *Lehman* v. *Shaker Heights, supra*, 418 U.S. 298, the public transit authority was held to have reasonably prohibited campaign signs from advertising space in its transit system vehicles, even though it permitted commercial signs in general.  There the court treated political or public issue matters as a distinct subject of advertising.  (*Id.*, at pp. 303-304.)

While a school district may have a legitimate basis for proscribing political advertising at certain times and places (see 77 Ops.Cal.Atty.Gen. 56 (1994)) or rejecting an advertisement

because of its controversial nature or provocative content, we do not find reasonable justification for a rejection of an otherwise appropriate advertisement which contains the Ten Commandments.

In the first place, there is little chance that the school may be seen as endorsing the religious views expressed in the advertisement since we have posited that the names of advertiser's business are prominently displayed on the sign and the sign would appear alongside others in an area clearly set aside for commercial messages. High school students are sufficiently mature to take into account the context and content of billboard-type messages and to distinguish them from the state sponsored curriculum. In this regard we note that the great religions of the world and their belief systems are a common subject of study in history classrooms at the high school level.

Unlike the blackboard in a classroom, commercial advertising space on a fence surrounding the high school baseball field is not logically associated with the views of the teacher. Even if the baseball field were to be viewed as the coach's classroom, high school athletes would surely know that the advertiser, who is identified on the sign, does not speak for the coach. Nor can the spectators at a high school baseball game be considered a captive audience. Perhaps parents and siblings of the players may feel compelled to attend the games, but being at a baseball park is not like being in the close confines of a classroom or a transit system vehicle. The focus of the spectator is the action on the field; a spectator may easily avert his gaze from any particular advertisement at a ballpark, just as one might normally do to avoid looking at a banner supporting the opposing team.

Second, we observe that a ban on advertisements which contain religious doctrine or teachings is, in effect, a policy which precludes a religious perspective in advertising. To deny business owners the ability to advertise their products and services from a religious perspective is to discriminate against advertising based on its viewpoint. For example, under their rule, the school district would apparently accept an advertisement from the local scouting council that says "Join the Girl Scouts," but reject the same advertisement if it also displayed the Girl Scout Oath, merely because of the presence of the word "God." In effect, this would constitute government preference for secular expression over religious expression. "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." (*City Counsel of Los Angeles* v. *Taxpayers for Vincent* (1984) 466 U.S. 789, 804.) Any prohibition of religious oriented advertising where other advertising is permitted is inherently non-neutral with respect to viewpoint. (See *Church on the Rock* v. *City of Albuquerque* (10th Cir. 1996) 84 F.3d 1273, for a discussion of the distinction between content discrimination and viewpoint discrimination.)

As stated in *Cornelius* v. *NAACP Legal Defense & Ed. Fund, supra,* 473 U.S. 788:

"Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum ... the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." (*Id*, at p. 806.)

As previously determined, the advertisement involved here is, notwithstanding its religious content, commercial speech and therefore within the purpose of the forum. We are not presented with the advertising of a product which may not be purchased legally by high school age students (e.g., tobacco products or alcoholic beverages) or a service which is a matter of considerable controversy among parents and educators (see e.g., *Planned Parenthood* v. *Clark County School District, supra*, 941 F.2d 817).

Since the displayed religious doctrine does not, in these circumstances, create an Establishment Clause[6] problem, and since its sponsorship and import are highly unlikely to be misconstrued by students at the high school level, we conclude that it would be unreasonable for a school district to reject an otherwise acceptable advertisement which contains the Ten Commandments, and further that it would be an impermissible form of viewpoint discrimination for the district to do so. Therefore, under the First Amendment, a school district which sells commercial advertising space on a fence surrounding its high school baseball field may not refuse to accept an otherwise appropriate advertisement which contains the Ten Commandments and clearly identifies the advertising party.

* * * * *

---

[6]    "[T]o discriminate against a particular point of view ... would ... flunk the test ... [of] *Cornelius*, provided that the defendants have no defense based on the establishment clause." (*Lamb's Chapel* v. *Center Moriches Union Free School District, supra,* 508 U.S. at 394, quoting *May* v. *Evansville-Vanderburgh School Corp.* (7th Cir. 1986) 787 F.2d 1105, 1114.)