[No. D047702. Fourth Dist., Div. One. Nov. 30, 2006.]

PHILIP K. PAULSON, Plaintiff and Respondent, v.
CHARLES ABDELNOUR, as City Clerk, etc., et al., Defendants and
Appellants;
SAN DIEGANS FOR THE MT. SOLEDAD NATIONAL WAR
MEMORIAL, Real Party in Interest and Appellant;
MIKE SHELBY, Intervener and Appellant.

404

**COUNSEL**

Michael J. Aguirre, City Attorney, and David J. Karlin, Deputy City Attorney, for Defendants and Appellants.

Robert Tyler, Jay Alan Sekulow and Erik M. Zimmerman for Advocates for Faith & Freedom and American Center for Law & Justice as Amici Curiae on behalf of Defendants and Appellants.

Brian Chavez-Ochoa for The National Legal Foundation as Amicus Curiae on behalf of Defendant and Appellant Charles Abdelnour.

Sue Ellen Wooldridge, Assistant Attorney General, Ryan D. Nelson, Deputy Assistant Attorney General, and Kathryn E. Kovacs for the United States Department of Justice as Amicus Curiae on behalf of Defendant and Appellant City of San Diego.

Law Offices of Charles S. LiMandri, West Coast Regional Office of the Thomas More Law Center, Charles S. LiMandri and Teresa Mendoza for Real Party in Interest and Appellant.

Timothy D. Chandler for The American Legion and The American Legion Department of California as Amici Curiae on behalf of Real Party in Interest and Appellant.

Edwin Meese III and Eric Carleson for The American Civil Rights Union as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Robert P. Ottilie for Intervener and Appellant.

James E. McElroy for Plaintiff and Respondent.

---

## OPINION

**BENKE, Acting P. J.**—In 1954 the City of San Diego (City) permitted a private veterans group to construct and thereafter maintain a large Latin cross (the cross)[1] on city parkland at the top of Mount Soledad. In 1991 the United States District Court for the Southern District of California held that because a Latin cross is the preeminent symbol of Christianity, its placement on Mount Soledad violates California's prohibition against preference of a religion. The court granted a permanent injunction forbidding the presence of the cross and gave the City three months to comply with its order. What followed were two attempts by the City to divest itself first of the cross, then of the cross and part of the land on which it sits. Those efforts were found by federal courts to run afoul of article I, section 4 (the no preference clause) and article XVI, section 5 (the no aid to religion clause) of the California Constitution.

---

[1] A cross having a stem longer than its other three arms.

In December 2004 the United States Congress passed legislation (Consolidated Appropriations Act, 2005, Pub.L. No. 108-447, Div. J., § 116 (Dec. 8, 2004) 118 Stat. 2809 (hereafter Public Law No. 108-447), declaring that upon donation of the Mount Soledad site to the federal government it would be designated a national veterans memorial and placed under the control of the Department of the Interior. In July 2005 Proposition A was passed by the voters of San Diego. Proposition A mandates the donation. Plaintiff and respondent Philip K. Paulson sought, and the trial court granted, an order invalidating Proposition A. The trial court based its decision on both article I, section 4 and article XVI, section 5 of the California Constitution. This appeal by the City, and aggrieved parties Mike Shelby and San Diegans for the Mt. Soledad National War Memorial, follows.

We reverse.

## BACKGROUND

Because of their significance to the issues before us, we begin with a detailed recitation of the history of the Mount Soledad cross and the passage of Proposition A.

### A. *History and Use of Mount Soledad's Crosses*

The existing cross is not the first to stand at the top of Mount Soledad. In 1913 private citizens constructed a redwood cross on a 170-acre parcel owned by the City. In 1916 the City dedicated the property as parkland. Vandals destroyed the redwood cross in 1923. In 1934 someone replaced it with a stucco and wood cross, which was destroyed by a windstorm in 1952. Later in 1952, the City granted permission to a private organization, the Mount Soledad War Memorial Association (Association) to erect the present cross. The Association solicited private contributions and, without municipal funding, supervised and paid for the construction of the cross. The reinforced concrete cross is 29 feet tall. Including its base, the cross is 43 feet high and weighs 24 tons. It is visible from an interstate highway and is regarded as a geodetic marker in the city.

The cross was dedicated on Easter Sunday 1954 by the Association as a memorial to veterans of World War I, World War II and the Korean War. Although the Association maintained the site with primarily private funds, some public funds have in the past been used to assist with the maintenance. On January 30, 1991, the Association was instrumental in having the cross designated as a historical monument in the City.

During the course of the City's multiple attempts to sell or otherwise transfer the Mount Soledad site and proceedings in the federal courts voiding those attempts, the monument expanded. Over the years the Association invested what it estimates to be close to $1 million in upgrades. It appears nearly all of these improvements were completed at a time the Association believed it had valid legal title to the real property. In proceedings below, Paulson represented that by 2002 approximately 90 percent of the current improvements were completed. Today the memorial consists of six concentric walls capable of holding 3,200 black granite plaques purchased by donors who may have them engraved with the names and photographs of veterans. At the time of the proceedings in the superior court, approximately 1,600 of those plaques were in place honoring service men and women. The plaques include those dedicated to individuals from the United States Army, Navy, Marine Corps, Air Force, Coast Guard and the Merchant Marine. The memorial includes a flagpole and American flag, 23 bollards honoring community and veteran organizations and brick paving stones honoring veterans and supporters.

The Association has used the monument for secular and sectarian purposes. Following dedication the Association obtained a permit each year from the City to conduct sunrise services on Easter morning. The Association has also used the site to conduct at least one Memorial Day ceremony honoring veterans. The public uses the memorial as the site of weddings and, apparently, a few baptisms.

B. *Legal History*

In 1989 Paulson initiated an action in the United States District Court against the City, seeking to enjoin the City from allowing the cross to remain on public land in violation of the California and United States Constitutions. In response, the City urged the cross was an historic war memorial that no longer had any sectarian meaning. On December 3, 1991, the district court issued an injunction prohibiting the permanent presence of the cross at the Mount Soledad site. The court's ruling was upheld on appeal. (*Murphy v. Bilbray* (S.D.Cal. 1991) 782 F.Supp. 1420, 1438, affd. in *Ellis v. City of La Mesa* (9th Cir. 1993) 990 F.2d 1518, cert. denied *sub nom. County of San Diego v. Murphy* (1994) 512 U.S. 1220 [114 S.Ct. 2707, 129 L.Ed.2d 834].)

In order to comply with the ruling of the federal court, the City sought to sell to the Association for $14,500 the cross and a 222-square-foot plot of land underneath it. The sale was not by bid. It was structured as a negotiated

sale to a nonprofit organization. Voter approval of the sale was required and the matter was placed on the ballot as Proposition F. The proposition sought approval to sell "that portion of Mt. Soledad Natural Park necessary to maintain the property as an historic war memorial." Proposition F passed and the City went forward with the sale. However, citing article I, section 4 and article XVI, section 5 of the California Constitution, the federal district court found the sale unconstitutional. (*Murphy v. Bilbray* (S.D.Cal. Sept. 18, 1997, Civ. Nos. 90-134, 89-820) 1997 U.S. Dist. Lexis 23707.)

In 1998 the City once again offered the site for sale. The Association agreed to quitclaim any interest it might have in the memorial to the future buyer in exchange for the City authorizing an expenditure of $14,500 to refund the Association its purchase money for the first sale. In its "Invitation for Purchase Proposals" the City stated it was " 'inviting proposals from private non-profit corporations interested in purchasing approximately one-half acre of property in the Mt. Soledad Natural Park *for the purpose* of *maintaining an historic war memorial.* The property is presently the site of a large, concrete, Latin cross.' " (*Paulson v. City of San Diego* (9th Cir. 2002) 294 F.3d 1124, 1127.) The City neither required nor precluded the retention or maintenance of the cross in its invitation for proposals. The City received 42 requests for the bid proposal packets and eventually five bids. Bids for the .509 acres of land were evaluated using a criterion that included the bid amount, financial capability of the purchaser, expertise on the use of historic war memorials and the proposed use, regardless of the retention of the cross. The Association offered the winning bid of $106,000, took title to the property and continued making improvements to the memorial.

Paulson challenged the second sale, arguing that the process was heavily weighted in favor of the Association and conferred a substantial benefit on religion. The sale was upheld at district and appellate court levels. However, in *Paulson v. City of San Diego, supra*, 294 F.3d 1124, the circuit court sitting en banc found unconstitutional the attempt to sell the land. The court held that by establishing the maintenance of a sectarian war memorial as a condition of sale and then providing gratis the means to satisfy that condition to only those bidders who supported the preservation of the cross, the City gave a direct, immediate and substantial economic incentive to advance a sectarian message in violation of article XVI, section 5 of the California Constitution. The court did not reach the issue of whether the sale violated article I, section 4 of the California Constitution. (*Paulson*, at p. 1133.)

On remand in August 2004, Paulson and the Association discussed a plan to seek court approval for relocation of the cross as a remedy for the constitutional infirmity associated with the second sale of the property. The City, however, argued that the second sale to the Association was declared void and title to the property should be returned to the City. The district court found the second sale of land to the Association void *ab initio*. (*Paulson v. City of San Diego* (S.D. Cal., Civ. No. 89-0820, docket No. 249).) The court also noted it was "mindful of the monies spent and the improvements made by the Association to develop the memorial site." The court stated the next question was a determination of the various rights and interests of the parties in the many improvements made and the cross itself. It requested briefing on the issue. Both Paulson and the Association appealed. (9th Cir. Ct. App., case No. 04-56995, docket No. 255, case No. 04-57032, docket No. 260.) No briefs were filed. By motion of each party the appeals were later dismissed, leaving in place the district court's ruling that the second sale was void *ab initio*.

Meanwhile, the City proposed a third sale of the Mount Soledad site. Proposition K, which was placed on a November 2, 2004, ballot sought voter approval to "sell to the highest bidder a portion of Mount Soledad Natural Park, subject to a lease to the Mount Soledad Memorial Association to preserve and maintain the existing granite walls and plaques, and to transfer ownership of the cross to the new buyer who will determine whether to maintain, relocate, or remove the cross or to replace it with another appropriate monument." This ballot measure did not pass and thus the sale was not authorized.

By Public Law 108-447, the Mount Soledad site was designated a national veterans memorial. The act providing for the designation recites: "Not later than 90 days after the date on which the City of San Diego, California, offers to donate the Mt. Soledad Veterans Memorial to the United States, the Secretary of the Interior shall accept, on behalf of the United States, all right, title, and interest of the City in and to the Mt. Soledad Veterans Memorial." (Pub.Law No. 108-447.) The act further states that upon acquisition of the memorial by the United States, the Secretary of the Interior "shall administer the Mt. Soledad Veterans Memorial as a unit of the National Park System, except that the Secretary shall enter into a memorandum of understanding with the Mt. Soledad Memorial Association for the continued maintenance by the Association of the cross and surrounding granite memorial walls and plaques of the Memorial." (*Id.*, § 116 (c).)

On March 8, 2005, following a public hearing, the San Diego City Council (city council) adopted San Diego Resolution No. R-300207 (hereafter

R-300207), declining to donate to the federal government its rights, title and interest in the memorial. However, a referendary petition called for the city council to rescind R-300207. The city council did so by a second resolution, San Diego Resolution No. R-300437 (hereafter R-300437). On May 17, 2005, by San Diego Ordinance No. O-19378 (hereafter O-19378) the city council placed Proposition A on a special July 26, 2005, election ballot allowing the electorate to directly decide whether the invitation offered by the federal government should be accepted.

### C. *Proposition A*

The factors underlying how and why Proposition A was placed on the ballot and the manner it proceeded through the trial court are also of significance to the validity of the transfer and other issues raised by the parties on appeal.

Proposition A appeared on the ballot in the following form: "Shall the City of San Diego donate to the federal government all of the City's rights, title, and interest in the Mt. Soledad Veterans Memorial property for the federal government's use of the property as a national memorial honoring veterans of the United States Armed Forces?"

On June 24, 2005, Paulson filed in the Superior Court of San Diego County the present petition for peremptory writ of mandate and request for injunctive and declaratory relief. The petition named as respondents Charles Abdelnour in his official capacity as City Clerk of the City of San Diego and Mikel Haas in his official capacity as Registrar of Voters for the County of San Diego. The petition sought to restrain the named respondents from using public funds to carry out the ordinance that placed Proposition A on the ballot and for a declaration that Proposition A was unconstitutional. In the alternative, Paulson requested the court declare that a two-thirds vote was needed for passage rather than a simple majority.

By an ex parte hearing held on June 28, 2005, Paulson requested the court expedite the briefing schedule on his petition and hear the matter no later than July 13, 2005. The full ex parte hearing transcript does not appear in our record.

On July 13, 2005, the court issued its tentative ruling and heard opposition to Paulson's petition filed by the San Diego City Attorney's Office on behalf

of Charles Abdelnour in his official capacity. The trial court invited attorney Charles LiMandri, representing San Diegans for the Mt. Soledad National War Memorial,[2] an amicus curiae in the case, to argue the constitutional issue, but deferred consideration of the constitutional issues until after the election.

At the conclusion of the July 13, 2005, hearing the trial court requested further briefing on two issues of importance to its final ruling: The title and ownership interests in the Mount Soledad site and the federal government's ability to change the use of the site if it were to be transferred under Proposition A. With respect to the ownership and title issue, the court and the parties discussed whether the Association was a necessary party or at a minimum the importance of the Association's presence and participation in the proceedings. Paulson's counsel urged the Association was not a necessary party but stated he would invite the Association to participate if it wished. A further hearing was set for July 21, 2005.

Citing language in federal cases and declarations of an Association member, Paulson filed a supplemental brief in preparation for the July 21, 2005, hearing, arguing that the evidence demonstrated the Association, not the City, owns the Mount Soledad site. He also argued that because the City had no rights, title or interest in the cross, it could transfer no interest in the cross and the proposition incorrectly informed voters that the cross would be transferred. Additionally, Paulson argued that two-thirds of the voters needed to approve the proposition rather than a majority of the voters. He pointed out that the proposed transfer to the federal government in fee gave no guarantees that the United States in general and the Department of the Interior in particular would devote the land to parkland. As such, he argued article V, section 55 of the San Diego City Charter (City Charter) required the two-thirds vote. The City, still representing City Clerk Charles Abdelnour, also filed a supplemental brief. The City argued that under Proposition A the National Park Service could not change the use of the site as a veterans memorial and further, a majority vote was permissible because the site would be accepted by the federal government as parkland.

On July 21, 2005, the court heard argument. The Association, which appeared through counsel, filed a declaration in support of its ownership interest. It further argued it made substantial improvements in reliance on what it believed to be legal purchases of the memorial.

The court thereafter confirmed its preelection tentative ruling.

---

[2] San Diegans for the Mt. Soledad National War Memorial is to be distinguished from the Association, the veterans group that built and maintains the memorial.

The trial court noted the federal district court ruling on the status of the second sale was still on appeal and thus there was "not a final Federal Court determination as to whether the city has title to the land." The court stated that the evidence indicated the City and the Association agree the Association owns the improvements. "Thus, the contemplated donation would appear to require concurrent donation by the Association. Neither Proposition A nor any writing in evidence includes such an agreement to donate." The trial court stated the ownership interest of the land should be left for the federal court to decide.

On the question of the necessary vote, the court agreed with Paulson and concluded City Charter article V, section 55 required a two-thirds vote for passage of Proposition A. The express rationale of the court was that the federal legislation accepting the property (Pub.L. No. 108-447) does not specify the memorial will in perpetuity be administered as a unit of the National Park System and that an agreement still needed to be worked out between the Department of the Interior and the Association. The court noted that while in the short term there might not be an intention expressed to change the use of the land, there were no guarantees that the land would remain parkland in the long term, as evidenced by other parkland being decommissioned. The court further observed that pursuant to 16 United States Code section 4601-22(b), the Secretary of the Interior is authorized to exchange national parkland for other property in the same state.

Proposition A passed on July 26, 2005, by 76 percent of the vote.[3]

On September 1, 2005, without further argument the trial court released its proposed tentative opinion declaring Proposition A unconstitutional.

The following day, on September 2, 2005, at an ex parte hearing, counsel for Paulson requested a temporary restraining order against the City in light of the city manager's planned transfer of title to the Mount Soledad site by quitclaim deed to the federal government. Counsel for the Association, the City (for Charles Abdelnour) and the County of San Diego (for Mikel Haas) were also present. The court issued an order restraining the City from transferring any right, title or interest in the site until argument. The hearing on the constitutionality of Proposition A was moved up in time from October 13, 2005, to October 3, 2005, and Mikel Haas, as Registrar of Voters for the

---

[3] There were 600,505 registered voters in the City of San Diego at the time of the special election. There were 259,498 votes cast on Proposition A. The "yes" votes numbered 197,125.

County of San Diego, was dismissed from the law suit, with prejudice. The court removed the "for counsel's use only" from the proposed tentative ruling and it was designated a "tentative" opinion.

On September 23, 2005, the City notified the court that LiMandri, who previously appeared at the July 13, 2005, hearing, representing amicus curiae San Diegans for the Mt. Soledad National War Memorial, would be serving in the limited capacity of special assistant to the city attorney and would be joining Deputy City Attorney David J. Karlin in the defense of City Clerk Charles Abdelnour. Abdelnour was still the named City respondent in the action.

Mike Shelby on September 30, 2005, filed a motion to intervene. Shelby represented to the court that he was the individual who obtained and signed the referendary petition and obtained signatures and documents leading to the city council rescinding R-300207 and placing Proposition A before the voters. Paulson objected to Shelby obtaining intervener status.

On October 3, 2005, the court heard arguments on the constitutionality of Proposition A. It also heard Paulson's objections to LiMandri's appointment as a special assistant to the city attorney, and arguments by the Association, asserting its ownership interest in the Mount Soledad site. The court took the matters before it under submission.

On October 7, 2005, the court recognized the association of LiMandri as a special assistant city attorney. The court denied Shelby's application for leave to intervene as a real party in interest, indispensable or necessary party. The court granted Paulson's motion to amend the petition for writ of mandate to add the City as a party respondent. The court found O-19378 placing Proposition A on the ballot and Proposition A unconstitutional preferences for religion in violation of article I, section 4 of the California Constitution. It also found the transfer of the memorial an unconstitutional aid to religion in violation of article XVI, section 5 of the California Constitution.

At a hearing held on October 31, 2005, San Diegans for the Mt. Soledad National War Memorial and Shelby brought motions to vacate the court's order. In addition, Shelby brought a motion requesting the court reconsider its prior ruling denying his request to intervene. The court stated there was no need for a hearing.[4] The court added the City as a respondent by interlinea-

---

[4] The minutes of the court indicate the court denied the motions.

tion on the face of the original petition for peremptory writ of mandate. Paulson indicated he would file an amendment formally naming the City and he did so.

Judgment was entered November 28, 2005, against Charles Abdelnour, in his official capacity as city clerk, and the City.

The court issued a minute order on January 18, 2006, granting attorney fees and costs to Paulson in the amount of $268,541.02. The award was made pursuant to California Code of Civil Procedure section 1021.5.

The City filed a timely notice of appeal. San Diegans for the Mt. Soledad National War Memorial and Shelby filed notices of appeal as aggrieved parties.

While this appeal was pending, the federal district court issued an order directing the City to remove the cross, or effective August 1, 2006, begin paying a penalty of $5,000 per day. (*Paulson v. City of San Diego* (S.D.Cal. May 3, 2006 No. 89-0820) 2006 U.S. Dist. Lexis 44740.) On June 20, 2006, we expedited the appeal in this court. The United States Supreme Court on July 7, 2006, issued a stay of the district court's order.

## DISCUSSION

### I

A. *The appeals filed are not moot.*

Appellants and Paulson note that on July 20, 2006, the President of the United States signed into law a condemnation by eminent domain of the Mount Soledad site. (H.R. No. 5683, 109th Cong., 2d Sess. (2006).) The description of the property seized is the same as that set forth in Public Law No. 108-447, which includes the entire parkland, cross and monument. The condemnation places the site within the jurisdiction of the Department of Defense. Under the terms of the law, price negotiation between the City and the federal government may take up to a year. If no agreement is reached during that time period, the Secretary of Defense is authorized to initiate a proceeding in any court of competent jurisdiction to determine the just compensation to be paid.

This case is not one involving merely abstract or academic questions of law. The eminent domain seizure may take a year or more to complete.

Moreover, the parties inform us that the seizure is currently subject to multiple challenges in the Federal District Court for the Southern District of California.[5] Should those cases when final conclude the eminent domain action is invalid, a finding that Proposition A is legal will be of importance.

Finally, the controversy surrounding legality of the cross and attempts to transfer it have occupied the public and parties to this action for nearly 17 years. Passage of Proposition A, which was the result of public debate followed by a special election, is part of the continuing controversy. Under the circumstances the public especially is entitled to a clear statement as to whether and why its action is, or is not, constitutional. Our obligation to set forth such a statement is important not only because the appeals raise issues of continuing significance, but because there is scant authority directing how those issues should be decided.

For the reasons noted this case is not moot and in any event we think it appropriate to resolve the issues raised.[6] (See generally *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1202, fn. 8 [31 Cal.Rptr.2d 776, 875 P.2d 1279]; *People v. Englebrecht* (2001) 88 Cal.App.4th 1236, 1242, fn. 1 [106 Cal.Rptr.2d 738].)

B. *San Diegans for the Mt. Soledad War Memorial and Mike Shelby are aggrieved parties for purposes of appeal.*

We are also called upon to determine whether Shelby and San Diegans for the Mt. Soledad National War Memorial are aggrieved parties entitled to bring an appeal in this action. We conclude they are.

---

[5] *Trunk v. City of San Diego*, United States District Court, Southern District of California case No. 06-01597 challenges the validity of the eminent domain seizure under both California and United States Constitutions. It is consolidated with *Jewish War Veterans of the United States, Inc. v. Rumsfeld*, United States District Court, Southern District of California case No. 06-01728, which challenges under the establishment clause of the United States Constitution the display of the cross on federal property. In addition, we are informed that an appeal based on California law, and related to prior attempts to sell the Mount Soledad site, remains pending in the Ninth Circuit Court of Appeals. (*Paulson v. City of San Diego*, United States Court of Appeals for the Ninth Circuit, case No. 06-55769 consolidated with case Nos. 06-55835 & 06-55919.)

[6] Following oral argument we received notice that on October 25, 2006, respondent Mr. Paulson died. Paulson's counsel requests that in light of his death we declare the appeals moot and dismiss the case. Mr. Paulson's death, however, does not affect the appeal of any party before the court. Moreover, we disagree with counsel's assertion that with his death, Mr. Paulson can no longer obtain the relief he sought in the trial court. As evidenced by the attorney fees awarded to him under California's private attorney general statute (Code Civ. Proc., § 1021.5), Paulson seeks to vindicate not only his own personal rights, but important rights affecting the public interest. We therefore exercise our inherent discretion to resolve the issues raised, which are at great interest to the public. (*Konig v. Fair Employment & Housing Com.* (2002) 28 Cal.4th 743, 745–746, fn. 3 [123 Cal.Rptr.2d 1, 50 P.3d 718].)

At a time when the City was not yet formally joined as a party on the question of the constitutionality of Proposition A, Shelby sought an ex parte hearing allowing him to intervene as an indispensable, necessary or interested party. While the record is not clear why the matter was not set, Shelby thereafter appeared at the October 3, 2005, hearing, and at that time requested the court set the matter for a noticed hearing. He indicated his concern that no party was representing the public's interest. The court took the matter under submission and by its order filed October 7, 2005, denied Shelby's request. At the same time it added the City as a responding defendant. Shelby thereafter filed motions to reconsider the court's denial of his motion to intervene and a separate motion under Code of Civil Procedure section 663 to vacate the finding that the transfer under Proposition A was unconstitutional. The court called an ex parte hearing to consider the motions. At an ex parte hearing held October 31, 2005, the court denied the requests without setting the matters for further hearing. The court also denied the request to vacate filed by San Diegans for the Mt. Soledad National War Memorial.

Clearly, Shelby and San Diegans for the Mt. Soledad National War Memorial were instrumental in the referendary petition and election processes leading to the passage of Proposition A. Shelby signed the petition resulting in the City's rescission of R-300207 and with the assistance of others, including San Diegans for the Mt. Soledad National War Memorial, circulated the petition. Prior to the special election counsel for San Diegans for the Mt. Soledad National War Memorial filed an amicus curiae brief on behalf of the organization and then appeared at the July 13, 2005, hearing on behalf of that group. At that time and at the court's invitation he argued the constitutionality of Proposition A. San Diegans for the Mt. Soledad National War Memorial spent approximately $100,000, and substantial "man hours" promoting passage of Proposition A.

■ One is "aggrieved" by a judgment and may become a party of record by moving to vacate a judgment pursuant to Code of Civil Procedure section 663. One is considered an "aggrieved party" if one's rights or interests are injuriously affected by the judgment. The interests so affected must be immediate, pecuniary and substantial and not nominal or a remote consequence of the judgment. (Code Civ. Proc., § 663; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736–738 [97 Cal.Rptr. 385, 488 P.2d 953]; *Simac Design, Inc. v. Alciati* (1979) 92 Cal.App.3d 146, 153 [154 Cal.Rptr. 676].) Given their involvement in passage of Proposition A, the resources spent in that passage, and their interests as expressed at trial, we conclude

both Shelby and San Diegans for the Mt. Soledad National War Memorial are aggrieved parties for purposes of appeal.[7]

## II

### *The Constitutional Challenge to the Transfer Mandated by Proposition A*

In 1991 the United States District Court for the Southern District of California held the cross at the top of Mount Soledad is a Christian symbol and its presence on city land violates the no preference clause of California's Constitution. For purposes of this appeal we need not revisit the initial holding of the federal district court.[8] That holding was appealed, and ultimately the United States Supreme Court denied certiorari on the issue. What is important is that given the legal position in which it found itself, the City had two choices. It could retain the parkland and remove the cross, or it could find a way to legally divest itself of the site. The City elected to divest itself of the site. Two attempts to do so were found unconstitutional. We are concerned here only with whether the transfer under Proposition A is constitutional.[9]

---

[7] At argument Shelby agreed that if we conclude he is an aggrieved party for purposes of appeal, we need not decide whether his motion to intervene was improperly denied. We therefore do not decide that issue.

In light of our conclusion that San Diegans for the Mt. Soledad National War Memorial is an aggrieved party, we deny Paulson's motion to dismiss the appeal filed by that group. The motion for sanctions brought against Paulson by San Diegans for the Mt. Soledad National War Monument is also denied. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649–650 [183 Cal.Rptr. 508, 646 P.2d 179].)

[8] We are aware that the memorial has been characterized as a sectarian war memorial. (*Paulson v. City of San Deigo, supra*, 294 F.3d at p. 1132; *Ellis v. City of La Mesa, supra*, 990 F.2d at p. 1527.) Because this conclusion predates *McCreary County v. American Civil Liberties Union of Ky.* (2005) 545 U.S. 844 [162 L.Ed.2d 729, 125 S.Ct. 2722] (*McCreary*) and *Van Orden v. Perry* (2005) 545 U.S. 677 [162 L.Ed.2d 607, 125 S.Ct. 2854] (*Van Orden*), that characterization may be subject to further exploration. It is, however, a task that is not before us.

[9] The trial court found the presence of the cross to be an unconstitutional preference for religion based on article I, section 4 of the California Constitution. Because we conclude the transfer to the federal government is proper, the cross is no longer situated on city land and thus we do not address whether its presence violates the California Constitution. The question of whether the cross is constitutionally placed on what is, because of the transfer, now federal land is not before us. Although we note that in its written opinion the trial court expresses the view the presence of the cross violates the federal establishment clause, that view assumed the cross was still located on City property. Comment on violation of federal constitutional rights was appropriate because under the trial court's ruling the City still had control over the placement of the cross. Nor can we properly or comfortably reach the question of whether the presence of the cross on federal parkland property would violate the establishment clause of United States Constitution. Such an inquiry is one which might require a separate action

A. *The transfer does not in itself violate the First Amendment
 establishment clause or the California Constitution.*

██ We begin by noting that donation of the Mount Soledad site to the federal government is not in itself improper or unconstitutional. The ability of the City to acquire and dispose of its property is broad. As a municipal corporation, the City has the general legal power and authority to "own and acquire property within or without its boundaries for either governmental or proprietary, or any municipal purpose either by succession, annexation, purchase, devise, lease, gift or condemnation, and may sell, lease, convey, exchange, manage and dispose of the same as the interests of said City may require." (City Charter, art. I, § 1.)

██ Contrary to concerns expressed by the trial court in its written opinion, and by Paulson on appeal, the conveyance of parkland mandated by Proposition A is not an improper gift of public funds. The City Charter authorizes conveyance and disposal of public land as the interests of the City may require. The caveat is that if disposal of parkland will result in a changed use, the disposal or conveyance must have the approval of two-thirds of the voters. We further note it is well-settled law in California that in determining whether an appropriation of public funds or property is to be considered an improper gift, the primary question is whether the funds are to be used for a "public" or "private" purpose (*County of Alameda v. Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11]) and whether the government action is expressly forbidden by general state law or the city's charter. (*West Coast Adver. Co. v. San Francisco* (1939) 14 Cal.2d 516, 521–522 [95 P.2d 138].) Transfer of funds or property for public purposes is permissible. The determination of what constitutes a public purpose is primarily a matter for the legislative body and all presumptions favor its validity; it will be upheld unless illegality clearly and unmistakably appears. (*County of Alameda v. Janssen, supra*, 16 Cal.2d at p. 281; *Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 206 [56 Cal.Rptr.2d 732]; *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 189–190 [118 Cal.Rptr.2d 330].) As noted, the donation of the Mount Soledad site is authorized by the City Charter. The donation fulfills important public purposes inasmuch as it operates to preserve parkland, one of the City's priorities, and divests the City of a costly and divisive public park site.[10]

---

against the federal government and would certainly require the presence of legal advisors for the federal government. No such complaint was filed here and no legal representative for the federal government was joined or made an appearance in the trial proceedings.

[10] There is direct authority for the proposition that a government entity may cure a constitutional defect existing on public property by selling the property in question. (*Freedom From Religion Found. v. City of Marshfield* (7th Cir. 2000) 203 F.3d 487, 491; *Utah Gospel Mission v. Salt Lake City Corp.* (10th Cir. 2005) 425 F.3d 1249, 1256; cf. *International Soc. for*

Finally, there is no argument presented or any authority cited to us standing for the proposition that the City may transfer the Mount Soledad site only if the cross is removed. We would have serious concerns respecting the prohibition of hostility to religion embedded in article I, section 4 of our Constitution and the federal establishment clause if, prior to otherwise divesting itself of land on which religious artifacts or icons rest, a government entity were required to remove or destroy them.

The question therefore is whether the donation mandated by Proposition A falls within the range of circumstances under which the City may constitutionally transfer the memorial. We conclude it does.

> B. *The transfer does not violate the First Amendment establishment clause or article I, section 4 establishment clause.*

■ Both the United States Constitution and the California Constitution forbid the establishment of religion.

The First Amendment to the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

(5) In relevant part article I, section 4 of the California Constitution states: "Free exercise and enjoyment of religion *without discrimination or preference* are guaranteed. . . . The Legislature shall make no law *respecting an establishment* of religion." (Italics added.) The California Constitution, thus, contains both a prohibition against the enactment of laws respecting the establishment of religion and a guarantee of the exercise of religion without discrimination or preference.

■ While the California Constitution is a document of independent force, the protections it creates in article I, section 4, concerning the establishment of religion are no broader than those created by the First Amendment of the United States Constitution and "coincide with the intent and purpose" of the federal establishment clause. The construction given by California courts to the establishment clause of article I, section 4, is guided by decisions of the United States Supreme Court. (*East Bay Asian Local Development Corp. v.*

*Krishna Consciousness, Inc. v. Lee* (1992) 505 U.S. 672, 699 [120 L.Ed.2d 541, 112 S.Ct. 2701] (conc. opn. of Kennedy, J.); see also *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 713 [102 Cal.Rptr.2d 280, 13 P.3d 1122] [the state may take neutral action to avert constitutional infirmity].)

*State of California, supra,* 24 Cal.4th at pp. 718–719.) In its most recent application of the California establishment clause, our state Supreme Court relied almost exclusively on United States Supreme Court cases interpreting and applying the federal establishment clause. (*Id.* at pp. 703-719.) Prominent among that authority is *Lemon v. Kurtzman* (1971) 403 U.S. 602, 612–613 [29 L.Ed.2d 745, 91 S.Ct. 2105]. *Lemon* presents a three-part test. First, the challenged municipal action must have a secular legislative purpose; second, the action's principal or primary effect must be one that neither advances nor inhibits religion; and finally, the action must not foster an excessive government entanglement with religion. (*Ibid.*)

The most recent United States Supreme Court case dealing with governmental involvement with a passive religious monument is *Van Orden, supra,* 545 U.S. 677 [125 S.Ct. 2854]. The question in *Van Orden* was whether the establishment clause of the First Amendment allowed the display of a monument inscribed with the Ten Commandments on the grounds of the Texas State Capitol. While the judgment was that the location of the monument did not violate the federal establishment clause, there was no majority opinion. The plurality opinion, written by Chief Justice Rehnquist, and joined by Justices Scalia, Kennedy and Thomas, questions the use of the *Lemon* test where government display of a passive monument is involved. The opinion regards *Lemon*'s three prongs as " 'no more than helpful signposts.' " (545 U.S. at p. 686 [125 S.Ct. at p. 2861].) Instead, the justices would employ a test of constitutionality driven by the nature of the monument, and the history and role of religion in the United States. (545 U.S. at pp. 684–687 [125 S.Ct. at pp. 2860–2861].) Writing separately, Justice Breyer believes instead that the purpose analysis of *Lemon* is still viable and controls the establishment clause issue presented. Because he felt there was no demonstration of an unconstitutional purpose in the case, he agrees with the conclusion but not the legal analysis of Justice Rehnquist's decision. (545 U.S. at pp. 698–699 [125 S.Ct. at p. 2868] (conc. opn. of Breyer, J.).) The dissent filed by Justice Souter, who is joined by Justices Stevens and Ginsburg, looks essentially to an examination of the " 'pre-eminent purpose' " of the monument. (545 U.S. at p. 737 [125 S.Ct. at p. 2892] (dis. opn. of Souter, J.).) A second dissent, written by Justice Stevens and joined by Justice Ginsburg, emphasizes the history, nature, appearance and setting of the monument. (545 U.S. at p. 707 et seq. [125 S.Ct. at pp. 2873–2875] (dis. opn. of Stevens, J.).) Justice O'Connor "[f]or essentially the reasons given by Justice Souter" also dissented (545 U.S. at p. 737 [25 S.Ct. at p. 2891] (dis. opn. of O'Connor, J.)).

■ On the same day the court decided *Van Orden,* it also decided *McCreary. McCreary* involves the display of the King James Bible's version of the Ten Commandments in the courthouses of two Kentucky counties. In an opinion written by Justice Souter and joined by Justices Stevens, O'Connor, Ginsburg and Breyer, the court found the displays violated the federal

establishment clause. The opinion notes that since the decision in *Lemon,* an important consideration in establishment clause analysis is whether the government action in question has a secular purpose. Purpose is determined by discoverable facts, such as the text of the act, its legislative history and its implementation. (*McCreary, supra,* 545 U.S. at. p. 863 [125 S.Ct. at pp. 2733–2735].) Applying a purpose analysis, the court found the display unconstitutional. Justice Scalia's dissent is joined by Chief Justice Rehnquist and Justice Thomas, and in part by Justice Kennedy. Consistent with their views in *Van Orden,* the dissenters urge a test of constitutionality governed by the history and nature of the monument, and the role of religion in the United States.

While *Van Orden* and *McCreary* present an unsettled debate respecting the application of the three-pronged *Lemon* test to government retention and control of passive monuments, there is no majority in either *Van Orden* or *McCreary* that disapproves its use or rejects the purpose analysis critical to the *Lemon* test. Indeed, *McCreary*'s majority reinforces its use. Given these decisions, and our belief that the *Lemon* test is useful in cases where as here the question involves government divestiture of a passive monument, we will use the *Lemon* test as a structure for our analysis and where applicable, employ the teaching of *Van Orden, McCreary* and California authority. (See *East Bay Asian Local Development Corp. v. State of California, supra,* 24 Cal.4th at p. 708.)

### 1. *Purpose*

When government acts with the ostensible and predominant purpose of advancing religion, it violates the central establishment clause value of official religious neutrality. (*McCreary, supra,* 545 U.S. at p. 860 [125 S.Ct. at p. 2733]; *Corporation of Presiding Bishop v. Amos* (1987) 483 U.S. 327, 335 [97 L.Ed.2d 273, 107 S.Ct. 2862]; *Fox v. City of Los Angeles* (1978) 22 Cal.3d 792, 797 [150 Cal.Rptr. 867, 587 P.2d 663].) In determining whether government action is neutral, a secular purpose must be shown. The secular purpose stated must be genuine, not a sham, and it may not be merely secondary to what is primarily a religious objective. (*McCreary, supra,* 545 U.S. at p. 864 [125 S.Ct. at p. 2735]; *Edwards v. Aguillard* (1987) 482 U.S. 578, 586–587, 590 [96 L.Ed.2d 510, 107 S.Ct. 2573]; *Stone v. Graham* (1980) 449 U.S. 39, 41 [66 L.Ed.2d 199, 101 S.Ct. 192] (*per curiam*).) It has been held that government action will be tainted where its purpose is "entirely motivated by a purpose to advance religion" (*Wallace v. Jaffree* (1985) 472 U.S. 38, 56 [86 L.Ed.2d 29, 105 S.Ct. 2479]), and we may look to see whether government activity is "motivated wholly by religious considerations" (*Lynch v. Donnelly* (1984) 465 U.S. 668, 680 [79 L.Ed.2d 604, 104 S.Ct. 1355]). These inquiries, however, are not determinative where it can be found that an

articulated secular purpose is implausible or trivial. (*McCreary, supra,* 545 U.S. at p. 865 [125 S.Ct. at p. 2736].)

*Lemon*'s purpose requirement aims to prevent government from abandoning neutrality and dividing the citizenry into those who are favored and those who are not. (*McCreary, supra,* 545 U.S. at p. 860 [125 S.Ct. at p. 2733]; *Santa Fe Independent School Dist. v. Doe* (2000) 530 U.S. 290 [147 L.Ed.2d 295, 120 S.Ct. 2266].)

The purpose of government action and therefore the existence of government neutrality is discerned from its text, structure, purpose and history as well as the body of evidence contained in the record. (*McCreary, supra,* 545 U.S. at pp. 861, 868 [125 S.Ct. at pp. 2734, 2738].) "The eyes that look to purpose belong to an ' "objective observer," ' one who takes account of the traditional external signs that show up on the ' "text, legislative history, and implementation of the statute," ' or comparable official act." (*Id.* at p. 862 [125 S.Ct. at p. 2734], quoting *Santa Fe Independent School Dist. v. Doe, supra,* 530 U.S. at p. 308, and *Wallace v. Jaffree, supra,* 472 U.S. at p. 73.) Thus the purpose for which government action takes place "emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." (*McCreary, supra,* 545 U.S. at p. 862 [125 S.Ct. at p. 2734].)

The text of Public Law No. 108-447 is neutral. In offering to accept a transfer of the Mt. Soledad property, the federal government in Public Law No. 108-447 makes no promises, nor embarks on an understanding, as to what will happen to the cross once it is transferred to the Department of the Interior. Paulson, however, notes that the acceptance language of Public Law No. 108-447 states the Secretary of the Interior "shall administer the Mt. Soledad Veterans Memorial as a unit of the National Park System, except that the Secretary shall enter into a memorandum of understanding with the Mt. Soledad Memorial Association for the continued *maintenance* by the Association of the cross and surrounding granite memorial walls and plaques of the Memorial." (Italics added.) Paulson argues this understanding constitutes an agreement the cross must remain standing after the transfer. We disagree.

The term "maintain" has multiple meanings. It means "to keep in existence or continuance; preserve; retain;" it also means "to provide for the upkeep or support of; carry the expenses of." (Random House Dict. of English Language (unabridged 2d ed. 1987) p. 1160.) The text of Public Law No. 108-447 does not inform as to which of these meanings is intended. Nor does the language of Proposition A, which does not itself direct who will maintain the Mount Soledad site after transfer. However, we note that in a letter dated March 15, 2005, Richard W. Pombo, Chairman of the United States House Committee on Resources, explains what the term "maintenance"

means in the context of Public Law 108-447. He notes the provision directing the Secretary of the Interior to enter into agreements with veterans groups to maintain memorials is "standard operating procedure for many units of the National Park System." He adds: "The Association has the finances and the willingness to continue to maintain the memorial, *and rather than further burden the National Park Service with increased costs*, having the Memorial Association take over this aspect of the memorial was an excellent alternative." (Italics added.) He further notes that while Public Law 108-447 describes the cross as part of the Mount Soledad memorial, the description arose because there was no map of the site. In order to describe what was included in the transfer, an inventory, including the cross, was listed along with the legal description. In any event we see nothing that allows the Association any veto power over the federal government's decision to keep the cross as a permanent part of the memorial or remove it.

Paulson's argument also assumes the Association is anxious to accept the cross and keep it permanently as part of the memorial. The record does not support this assumption. During proceedings in federal court, the Association entered into an agreement with Paulson respecting the removal of the cross from the Mount Soledad site. The Association made two appearances before the trial court in this case. Each time, and especially on October 3, 2005, it made clear through counsel that its priority was continuing in its role as caretaker for the veterans memorial. Keeping the cross as part of the memorial was not the Association's priority, and indeed at the October 3, 2005, hearing, it stated that it was amenable to replacing the cross if necessary to assure the continued existence of the veterans memorial.

We are satisfied the word "maintenance" means the Association may continue providing funds and care for the memorial. Nothing in the language or explanation of federal policy indicates an agreement to keep the cross as part of the memorial. Nothing in the record supports the conclusion that following transfer, the Association wants to, or has the power to, permanently keep the cross at the site.

Finally, and significantly, in its preelection ruling that a two-thirds vote was necessary for passage of Proposition A the trial court expressly concluded Public Law 108-447 gives no assurance the Department of the Interior will retain the cross or for that matter any of the existing monument. It noted as well the Department of the Interior could in the future exchange the property. In effect the trial court found the federal government made no promise to retain the cross.

The text of Proposition A is also neutral. Proposition A presented the following question to San Diego voters: "Shall the City of San Diego donate

to the federal government all of the City's rights, title and interest in the Mt. Soledad Veterans Memorial property for the federal government's use of the property as a national memorial honoring veterans of the United States Armed Forces?" The proposition divests the City of the entirety of the Mount Soledad site. It is understood by the language of the proposition that the site will be used by the federal government for federal parkland; a condition consistent with article V, section 55 of the City Charter, which sets as a priority the use and management of city parkland as parkland. There is no requirement or understanding by the City that the cross will remain on the property once a transfer takes place. The language of the supporting argument in the voter pamphlet does not persuade us otherwise. The language repeatedly references saving a war memorial built as a tribute to veterans who sacrificed their lives.

Despite the neutrality of language in the text of Public Law No. 108-447 and Proposition A, Paulson urges, and the trial court found, that the transfer mandated by Proposition A is a "sham" designed to ensure the cross, for the purpose of advancing religion, is retained following the transfer. We disagree.

While it is the court's duty to distinguish a sham secular purpose from a sincere purpose, the inquiry is limited and deferential; where the action is legislative in nature the court should be reluctant to ascribe unconstitutional motives, particularly if a plausible secular purpose can be discerned from the face of the statute. (*Mueller v. Allen* (1983) 463 U.S. 388, 394–395 [77 L.Ed.2d 721, 103 S.Ct. 3062]; *McCreary, supra*, 545 U.S. at. p. 863 [125 S.Ct. at p. 2735] [noting legislative bodies seldom set out to violate the Constitution].)

When, by passage of Public Law No. 108-447, the federal government offered to accept a donation of the Mount Soledad site, the City expressly refused the invitation (R-300207). Thereafter, a referendary petition carrying nearly 72,859 voter signatures was presented to the city council requesting R-300207 be rescinded. The statement of reasons presented on the referendary petition references "saving the cross" as part of a veterans war memorial.[11] On May 17, 2005, following a lengthy public hearing before the city council, the City passed R-300437, which rescinded R-300207. It again refused to pass an alternative resolution that would accept

---

[11] The referendary petition stated: "You can save the Mt. Soledad cross! The City Council refused to approve transfer of the Mt. Soledad Veterans War memorial (including the cross) to the federal government for inclusion in the national parks system of war memorials. This transfer would put the memorial on federal land and was authorized by federal legislation written by San Diego Congress members Duncan Hunter and Randy 'Duke' Cunningham and signed into law by President Bush. The City Council refused that life line and is now planning to tear down the cross. Your signature on this referendum will allow the voters to decide whether to transfer the land and the cross to the federal government as a war memorial."

the transfer offer. Instead, the City passed O-19378, which placed Proposition A before the voters. The text of O-19378 states: "Introduction and adoption of an Ordinance submitting to the qualified voters of the City of San Diego at a Special Municipal Election, one Proposition regarding whether or not the City shall donate to the United States all of the City's Rights, Title, and Interest in the Mt. Soledad Veterans Memorial property." There is no reference to the cross or religion.

The expression of intent accompanying O-19378 authorizing Proposition A states: "WHEREAS, upon considering the referendary petition, the City Council . . . determined that a clear and unambiguous Council-sponsored proposition on the subject of the Mt. Soledad Veteran's Memorial would be a more appropriate manner of ascertaining the will of the people with regard to the federal government's offer."

■ The history and the express intent of the city council in placing Proposition A before the voters reveals the fate of the Mount Soledad site was left to the democratic process. In this sense placing Proposition A on the ballot was an act of deference to political reality, not City support for a religion.

Paulson successfully urged at trial and argues on appeal that the statements of City officials and others involved in the political process that brought Proposition A to the ballot, newspaper articles, and references to "the cross" in the ballot materials supporting the donation demonstrate impermissible religious preferences and symbolic support for religion. There are two fatal flaws in this argument.

■ First, unlike prior attempts to divest the Mount Soledad site through sales, we are dealing with a transfer accomplished by a vote of the electorate. Statements and positions of elected officials and proponents or opponents of legislation are typically a part of the public debate inherent in the democratic process leading to that vote. Newspaper articles are also a part of the public debate. We do not believe that the position of any one advocate in, or interpreter of, vigorous public debate may be declared to reflect the ultimate position of all voters. The more appropriate question is whether the language of the initiative measure is sufficiently clear to compel the inference that the voters intended the cross be transferred for an illegal purpose, that is, in order to preserve it as a religious symbol or for a religious purpose. (See *Californians For Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 229–230 [46 Cal.Rptr.3d 57, 138 P.3d 207].) While one can hypothesize a situation where the language of a ballot proposition might clearly reflect an improper religious purpose, this is not such a case.

The language of Proposition A states the transfer of the Mount Soledad site would occur "for the federal government's use of the property as a national memorial honoring veterans of the United States Armed Forces." At the beginning of the Argument in Favor of Proposition A, which appears in the voter pamphlet, the following language appears: "Vote YES to save the Mount Soledad Memorial—AS IT IS, WHERE IT IS—with its centerpiece 29-foot cross, walls and plaques, by transferring it to the Federal government!" There is one additional express reference to the cross, as a part of the quality of life and landscape in San Diego. There is reference to "symbols of the fallen." The language of the argument is replete with references to transferring the entire site in order to retain it as an historic veterans war memorial. Given the language of Proposition A and the official ballot argument in favor of the proposition, we cannot conclude the individuals who voted for the proposition acted in order to establish the Christian religion or favor that religion.

Second, we take seriously cases from our state Supreme Court and United States Supreme Court reminding us that we should proceed with caution when invited to determine the motives of the electors whose votes are cast in the privacy of the ballot box. (*Californians for Disability Rights v. Mervyn's, LLC, supra*, 39 Cal.4th at pp. 229–230; see also *United States v. O'Brien* (1968) 391 U.S. 367, 383 [20 L.Ed.2d 672, 88 S.Ct. 1673]; *Arizona v. California* (1931) 283 U.S. 423, 455 [75 L.Ed. 1154, 51 S.Ct. 522].) Particularly is this so where as here there are multiple reasons that may motivate voters' choices individually and collectively. Neither we nor the parties to this action could ever discern the religious inclination or motives of the 72,859 persons who signed the referendary petition to rescind R-300207. Nor can we discern the motives of 197,125 individuals, 76 percent of those voting, who ultimately passed Proposition A. We cannot tell whether in casting a vote in favor of Proposition A an individual voter did so for a religious reason, a secular desire the cross remain as part of a veterans memorial or simply a neutral desire to transfer to another venue the issue of the cross's presence at the site. If on review this court, in such a complete factual vacuum, were to assess and then interpret voters' motives, we seriously risk supplanting our personal views for those of the voting public. The same flaws would occur were we to attempt to ascribe to voters the intent of any individual or group that supported or opposed the proposition or the placement of the proposition on the ballot. (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057]; see also *Board of Education v. Mergens* (1990) 493 U.S. 1014 [107 L.Ed.2d 732, 110 S.Ct. 711].)

In effect Paulson urges correction of what he perceives to be a trick played on the voters.[12] The trial court agreed with this argument, finding the process of bringing Proposition A to the ballot was a sham. For the reasons noted we decline on the facts of this case to go behind the curtain of the ballot box, but we add that there are other important institutional reasons for our conclusion.

As a corollary to the principle that establishment law analysis does not look to the "veiled psyche" of government officers, *McCreary* acknowledges that it is indeed possible savvy officials may succeed in disguising religious purpose so well that an objective observer acquainted with the text, history and implementation of the government action may not be able to see the government impropriety. (*McCreary, supra*, 545 U.S. at p. 863 [125 S.Ct. at pp. 2734–2735; *Wallace v. Jaffree, supra*, 472 U.S. at p. 74, O'Connor, J., concurring in the judgment.) This, however, is "no reason for great constitutional concern." (*McCreary, supra*, 545 U.S. at p. 863 [125 S.Ct. at p. 2735].) Because the improper purpose is so hidden, "without something more the government does not make a divisive announcement that in itself amounts to taking religious sides. A secret motive stirs up no strife and does nothing to make outsiders of nonadherents, and it suffices to wait and see whether such government action turns out to have (as it may even be likely to have) the illegitimate effect of advancing religion." (*Ibid.*)

These principles are helpful here. In the context of a public vote on a neutral ballot measure, we believe it inappropriate to invalidate that vote on the ground the public may have been tricked into approval of an unconstitutional measure establishing or preferring a religion. There have been approximately 17 years of open and controversial public debate concerning the cross and what purpose it serves as the centerpiece of the Mount Soledad site. During this period of time the lines of philosophy concerning the purpose and meaning of the cross have been clearly and publicly drawn. Cogent arguments have been made by the parties.

Given this history of the site and open nature of the debate, we do not believe the public as a whole or the individual voter would be easily fooled concerning what they cast their vote for, and more importantly why. We therefore follow the lead of the majority in *McCreary*. The language of Proposition A and Public Law No. 108-447 is neutral with respect to retaining the cross after transfer. The history leading to the City placing Proposition A on the ballot evidences a legitimate political purpose for doing so. There are multiple reasons advanced in favor of, or opposition to, the Proposition,

---

[12] We note Paulson's opposition to Proposition A, which appeared in the voter pamphlet, expressed concern the public was being misled as to the true purpose of the transfer and fate of the cross.

including that of keeping a secular veterans memorial. The decision concerning the fate of the cross was made by an educated public. With these observations in mind, any judicial attempt to discern or ascribe a hidden purpose behind a vote of the electorate would create rather than dispel divisiveness. As *McCreary* notes, in the face of sincere argument that silent impropriety drives public action, it is better to wait and see if there is an improper effect.

We are also mindful that changes to a monument will not support a finding of lawful purpose if they are actually sham "litigat[ion] positions." (*McCreary, supra*, 545 U.S. at p. 871 [125 S.Ct. at p. 2740].) In making such a determination here the trial court focused on the multiple unsuccessful attempts to sell the Mount Soledad site, and continued expansion of the site, as a basis for its conclusion that the City was engaged in a sham when it placed Proposition A on the ballot.

The multiple attempts to transfer the Mount Soledad site and cross prior to passage of Proposition A do not strike us as litigation positions. The attempts to divest the site were certainly occurring at the same time as litigation was progressing through the courts, but there is an important difference between an attempt by *government* to retain control over a passive monument by doctoring it to fit current litigation, as was the situation in *McCreary*, and a *purchaser* of a passive monument changing and expanding the monument in the good faith belief it owns the property and has the legal power to do so.

The changes in the Mount Soledad site were not made by the City, but by the Association, a private veterans organization that was twice the purchaser of the site; the first time, of the cross and land immediately under it, and then in the second sale, the cross, monument and substantial acreage. The planning and fundraising involved in the expansion were carried out by the Association. Moreover, as the presence of the cross compounded the Association's difficulties in establishing its veterans monument, the Association began to favor removal of the cross from the site. Thus the litigation did not result in the Association wanting to change the monument to keep the cross, rather the litigation resulted in the Association deciding the cross should be removed. The record reflects the approximately $1 million raised by the Association and spent on developing the memorial occurred because the Association believed it owned the site and was entitled to raise funds to expand it. The sincerity of the Association, which agreed with the trial court's decision invalidating Proposition A, was not questioned at trial nor has it been on appeal.

Finally, as part of its ruling that the City favors the Christian religion and the transfer of the site is a sham, the trial court notes that baptisms, weddings

and annual Easter sunrise services continue to occur at the memorial. Throughout the proceedings in this case and as noted in prior federal cases finding sales of the site unconstitutional,[13] these events are often referenced as activities that somehow impact the City's hidden religious preference or religious discrimination. We disagree. The record reflects the sunrise services are authorized through the city permit process and that permits are obtained by the Association, a private group, for the event. Nothing supports the conclusion that the Easter sunrise services are City events or are sponsored in any way by the City. To the extent weddings and baptisms occur at the site, we have nothing in the record that indicates the Mount Soledad site is treated differently than any other public park site in San Diego. Nor do we know if citizens engaging in the past weddings or baptisms needed to obtain permits, or if any of the individuals involved in those events did obtain necessary permits. In short, these activities do not define the City's involvement with the cross or monument. They define the ways in which the public chooses to use the monument. If we were to assume valid sectarian public use defines the City's purpose in permitting such use, we would by logic be pressed to the unfortunate position that such public use should end. This we believe would create an unacceptable hostility to religion.

### 2. Principal or Primary Effects

The second part of the *Lemon* test asks whether the primary or principal effect of the questioned government action endorses or prohibits religion. (*Lemon v. Kurtzman, supra,* 403 U.S. at p. 612.) In this context, "endorsement" means "promotion." (*Allegheny County v. Greater Pittsburgh ACLU* (1989) 492 U.S. 573, 593 [106 L.Ed.2d 472, 109 S.Ct. 3086].)

Essentially, we inquire here both as to whether the government is actually acting in a neutral manner and whether a reasonable observer who is reasonably informed as to the relevant circumstances would perceive the government to be acting neutrally. (*Good News Club v. Milford Central School* (2001) 533 U.S. 98, 114 [150 L.Ed.2d 151, 121 S.Ct. 2093]; *Board of Ed. of Kiryas Joel Village School Dist. v. Grumet* (1994) 512 U.S. 687, 696 [129 L.Ed.2d 546, 114 S.Ct. 2481].) For a law to have forbidden effects under the second prong of *Lemon,* "it must be fair to say that the government itself has advanced religion through its own activities and influence." (*Corporation of Presiding Bishop v. Amos, supra,* 483 U.S. at p. 337, italics omitted; see also *Fox v. City of Los Angeles, supra,* 22 Cal.3d at pp. 794–795.) The effect however, need not be material and tangible; it is sufficient if a symbolic benefit to a religion is shown, or, where other nonsectarian options are available, government has lent its prestige and power through a sectarian choice. (*Feminist Women's Health Center, Inc. v. Philibosian* (1984) 157

---

[13] See, e.g., *Ellis v. City of LaMesa, supra,* 990 F.2d at page 1527.

Cal.App.3d 1076, 1092 [203 Cal.Rptr. 918]; see also *Utah Gospel Mission v. Salt Lake City Corp., supra,* 425 F.3d at p. 1260; *Friedman v. Board of County Com'rs of Bernalillo* (10th Cir. 1985) 781 F.2d 777, 781.)

The transfer mandated by Proposition A does not evidence the City's advancement of religion. Neither the transfer by the City nor the acceptance by the federal government requires removal or retention of the cross. The cross may be removed at the discretion of the Department of the Interior. While the transfer requires the Department of the Interior enter into a maintenance agreement with the Association, as we previously noted, this does not constitute an agreement between the City and the Department of the Interior or the Association and the Department of the Interior that the cross or any part of the monument will be retained.

Nor does the transfer mandated by Proposition A send a religious message or symbolically support the Christian religion. However one characterizes the cross on Mount Soledad, as secular, sectarian or a combination thereof, its presence is a historical reality. It has been in place for over 50 years, since 1954. Its construction predates the first challenge to its presence by some 35 years. If the bare transfer of the cross constitutes a religious statement, the only remedy would logically be to eliminate the cross from the Mount Soledad site prior to any transfer. As we have previously noted, we find no such legal requirement exists, and indeed no such position has been taken by Paulson, the trial court or by any federal court that has considered the presence of the cross. In this sense, in any decision to implement a full divestiture of the parkland, the City has no alternative except to transfer the cross along with the entirety of the monument and real estate. (Cf. *Feminist Women's Health Center, Inc. v. Philibosian, supra,* 157 Cal.App.3d at p. 1092.)

### 3. *Excessive Government Entanglement with Religion*

 The third and final prong of the *Lemon* test provides that a challenged government action may not foster " 'an excessive government entanglement with religion.' " (*Lemon v. Kurtzman, supra,* 403 U.S. at p. 613.) In order to determine whether government entanglement with religion is "excessive," we examine the character and purposes of the institutions benefited, the nature of the aid provided by the government and the resulting relationship between the government and the religious authority. (*Id.* at p. 615.)

Under Proposition A, the City is required to end its relationship with the entire Mount Soledad site, including the cross. The effect of Proposition A is termination of the City's control and maintenance of the property, which

termination has a justifiable and beneficial effect of extricating the City from 17 years of litigation. Moreover, the donation mandated by the proposition is not grossly out of the norm of reasonable regulation of city parkland inasmuch as the donation succeeds in transferring the site for continuing use as parkland.

As an express basis for its ruling, the trial court found an excessive religious entanglement existed between the City and the Thomas More Law Center. We strongly disagree with this troublesome position.

Prior to the special election, LiMandri filed an amicus curiae brief on behalf of San Diegans for the Mt. Soledad National War Memorial. LiMandri is affiliated with the Thomas More Law Center, which sponsored San Diegans for the Mt. Soledad National War Memorial. The amicus curiae brief covered the issue of the constitutionality of Proposition A.

Although the court determined it would not rule on the issue of constitutionality until after the election, on July 13, 2005, LiMandri stated he could argue the matter if the court wished. The court invited him to do so. On September 23, 2005, following the special election, the City informed the court by written notice that LiMandri would be serving in the limited capacity of special assistant to the city attorney. At the time, the City was still officially appearing on behalf of the city clerk.

On October 3, 2005, the court heard the substantive arguments with respect to the constitutionality of Proposition A. LiMandri made an argument on behalf of the constitutionality of Proposition A and responded to Paulson's argument that he should not be allowed a special relationship with the City. The court took the matters argued under submission, including apparently the issue of LiMandri's relationship with the City.

On October 7, 2005, the trial court issued its final opinion on the constitutionality of Proposition A. At the outset of the opinion, the court recognized LiMandri's association with the City.

We observe the effect of LiMandri's status as a special assistant was quite limited. All parties and the court understood the City and the San Diegans for the Mt. Soledad National War Memorial were making nearly identical constitutional arguments in favor of Proposition A, and except that it allowed the City to have another experienced advocate argue the issue, the record does not reflect LiMandri did anything more for the City. Granted, the appointment gave LiMandri a chance to speak again, this time after the special election, on the question of constitutionality. To this extent the issue was further preserved. However, LiMandri made the same arguments he

made before the special election, and his argument for the City was made only at the October 3, 2005, hearing. It was an argument that had no effect on the court's conclusion that Proposition A was unconstitutional, a conclusion announced to the parties a month earlier, during the first week of September 2005.

 Finally, we have been directed to no authority in the San Diego City Charter or City ordinances prohibiting the San Diego City Attorney from appointing LiMandri as a special assistant. Section 40 of the San Diego City Charter grants broad discretion to the city attorney in appointment of assistants. In the absence of authority prohibiting the appointment, we are troubled by the proposition that a government entity or any individual appearing as an attorney before a court, on any issue, may first be screened for their sectarian or nonsectarian background or motives before being allowed to appear as an advocate. Whatever the actual propriety of the judicial determination here, such inquiries lead the judicial system into claims of hostility to religion and potential violations of the proviso that no religious test may ever be required of any individual to an office or public trust. (U.S. Const., art. VI, cl. 3.)

Given the fluid procedural posture of the case and parties at the time LiMandri was associated as a special assistant, the limited nature and at best minimal effect of his appearance on the trial court's opinion, the lack of evidence that LiMandri and the City joined together for religious purposes, and the ruling by the trial court approving the relationship, we find no excessive religious entanglement as that prohibition is intended to be applied by *Lemon*.

C. *The transfer does not violate the no preference clause of article I, section 4.*

 Although the California Supreme Court has held that the federal establishment clause and the establishment clause of article I, section 4 of the California Constitution are coextensive, the court has declined to definitively construe the no preference clause. (*East Bay Asian Local Development Corp. v. State of California, supra*, 24 Cal.4th at p. 718.)

Some authority suggests that under the no preference clause, preference is forbidden "even when there is no discrimination." (*Fox v. City of Los Angeles, supra*, 22 Cal.3d at p. 796; see *Sands v. Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 883 [281 Cal.Rptr. 34, 809 P.2d 809].) In addressing this authority, our state Supreme Court notes that in guaranteeing the free exercise of religion " 'without discrimination or preference,' " the plain language of the clause, suggests "that the intent is to ensure that free exercise of religion

is guaranteed regardless of the nature of the religious belief professed, and that the state neither favors nor discriminates against religion." (*East Bay Asian Local Development Corp. v. State of California, supra*, 24 Cal.4th at p. 719.)

We need not reconcile authority dealing with the breadth of California's no preference clause. In *East Bay* the court held that because the challenged government action satisfied all prongs of the *Lemon* test, it followed there was neither a preference for or against religion. (*East Bay Asian Local Development Corp. v. State of California, supra*, 24 Cal.4th at p. 719.) The same may be said here. Because we find the transfer satisfies the three-prong test of *Lemon*, which we also note incorporates such nonpreference concerns as symbolic support for religion (e.g., *Feminist Women's Health Center, Inc. v. Philibosian, supra*, 157 Cal.App.3d at pp. 1090–1092) and promotion of a religion (e.g., *Fox. v. City of Los Angeles, supra*, 22 Cal.3d 792), it follows that the transfer does not constitute a government preference for religion or discrimination against religion.

### D. *The transfer mandated by Proposition A does not violate article XVI, section 5.*

The trial court found the donation mandated by Proposition A violates article XVI, section 5 of the California Constitution. Article XVI, section 5, states in relevant part: "Neither the Legislature, nor any . . . city . . . shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by . . . any city . . . for any religious creed, church, or sectarian purpose whatever . . . ."[14]

In *California Educational Facilities Authority v. Priest* (1974) 12 Cal.3d 593, 604 [116 Cal.Rptr. 361, 526 P.2d 513], the court noted: "This section [article XVI, section 5 of the California Constitution] has been said to constitute 'the definitive statement of the principle of government impartiality in the field of religion.' (37 Ops.Cal.Atty.Gen. 105, 107 (1961).) An examination of the debates of the constitutional convention [that] drafted the Constitution of 1879 indicates that the provision was intended to insure the separation of church and state and to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes. (*Gordon v. Board of*

---

[14] The provision was formerly numbered article XIII, section 24; previously numbered article IV, section 30. The text has remained essentially unchanged. (3 West's Ann. Cal. Codes, Cal. Const. (1996 ed.) foll. art. 16, § 5, p. 53.)

*Education* (1947) . . . 78 Cal.App.2d 464, 472–473 [178 P.2d 488].) Under this section, the fact that a statute has some identifiable secular objective will not immunize it from further analysis to ascertain whether it also has the direct, immediate, and substantial effect of advancing religion."

Direct financial benefit may not be given to a particular religion, even where the purpose may be to preserve what is admittedly educational or historical. (*Frohliger v. Richardson* (1923) 63 Cal.App. 209 [218 P. 497] [public funds for restoration of California missions improperly benefited Catholic church].) Nor may a government entity lend financial assistance to a religion in such a way as to lessen its financial burdens. (*California Teachers Assn. v. Riles* (1981) 29 Cal.3d 794 [176 Cal.Rptr. 300, 632 P.2d 953] [superintendent of public schools may not lend without charge textbooks used in public schools to students attending nonprofit nonpublic schools].) Even if for the secular purpose of promoting tourism, a government entity may not enter into an exclusive contract with a religious organization which will result in the organization receiving a financial benefit from the government. (*County of Los Angeles v. Hollinger* (1963) 221 Cal.App.2d 154 [34 Cal.Rptr. 387] [county ordering films of Christian holiday parade to promote tourism improperly provided official support for the parade organizers and religious subject of the parade].)

The section "has never been interpreted, however, to require governmental hostility to religion, nor to prohibit a religious institution from receiving an indirect, remote, and incidental benefit from a statute which has a secular primary purpose." (*California Educational Facilities Authority v. Priest, supra,* 12 Cal.3d at p. 605.) In *Priest* the court noted that many expenditures of public funds give indirect and incidental benefit to denominational schools such as sidewalks, roads, sewers and fire and police protection that are furnished to all citizens regardless of religious belief. (*Ibid.*)

Relying on article XVI, section 5 of the California Constitution, and California case law, federal courts found unconstitutional the City's two prior sales of first the cross and then the monument site.

In October 1994 the City sold a small 15-foot by 15-foot, 222-square-foot, plot of land underneath the cross to the Association for $14,500. The sale was not by bid but was a negotiated sale to a nonprofit organization. The sale was lawful under various provisions of the City Charter. The City passed an ordinance to sell the land which was subsequently ratified by a two-thirds vote of the electorate. Citing article I, section 4 and article XVI, section 5 of the California Constitution, however, the federal district court found the sale unconstitutional. (*Murphy v. Bilbray, supra,* 1997 U.S. Dist. Lexis 23707.)

The court noted the exclusion of any other potential buyer of the property gave the appearance of preferring the Christian religion over others. It also promoted and aided the Christian religion because the sale assumed the Association would continue to illuminate the cross and permit its use for sectarian events. (*Murphy v. Bilbray, supra*, 1997 U.S. Dist. Lexis 23707.) The court also concluded that all other constitutional issues aside the sale of only 222 square feet of land beneath the cross showed an apparent preference for the Christian religion. (*Ibid.*)

In *Paulson v. City of San Diego, supra*, 294 F.3d 1124 an en banc panel of the court found the City's next attempt to comply with the district court's order by divesting itself of the land on which the cross sits also violated the California Constitution. In this second sale, the City expanded the size of the parcel to approximately one-half acre, invited bids and stated it was inviting proposals from nonprofit corporations interested in purchasing the half-acre site "for the purpose of maintaining an historic war memorial." (*Id.* at p. 1127, italics omitted.) The invitation stated: " 'The property is presently the site of a large, concrete, Latin cross. The City is neither requiring nor precluding the retention or maintenance of the cross in its invitation for proposals.' " (*Ibid.*)

The invitation required the bidder to state its experience and qualifications to maintain the property as a war memorial and provide a description of the proposed use and a detailed outline for the maintenance of the war memorial. The invitation for bids stated they would be evaluated on the basis of the bid amount, the financial capability of the bidder, expertise regarding the proposed use and use proposal. No statement was made concerning the weighting of the various factors. (*Paulson v. City of San Diego, supra*, 294 F.3d at p. 1127.)

The City received five bids. Three, including that of the Association, stated they would retain the cross. One proposed a memorial to honor veterans and the Bill of Rights. One proposed a monument to atheists and freethinkers. The Association's bid, which offered the highest sale price, was selected. The selection committee stated that the Association's bid was the most comprehensive and well thought out. The committee noted its lengthy history in maintaining the memorial and its connections to veterans groups which could aid in soliciting funds for maintenance. (*Paulson v. City of San Diego, supra*, 294 F.3d at p. 1128.)

The district court found the sale was not structured to prefer the Association and that the process for evaluating bids was neutral. It further found the sale did not violate the no preference clause of the California Constitution. The circuit court affirmed. (*Paulson v. City of San Diego, supra*, 262 F.3d

885.) However, the court en banc then reversed, concluding the structure of the sale violated article XVI, section 5 of the California Constitution because a purchaser that would keep the cross obtained a financial benefit over those who would remove it. (*Paulson v. City of San Diego, supra,* 294 F.3d at p. 1132.)

We find the transfer mandated by Proposition A does not violate article XVI, section 5 of the California Constitution. As we have noted, the City Charter authorizes the transfer of the entire site to another public entity and the donation here for parkland is not a gift of public funds. The structure of the transfer is not complicated. The entire site and everything on the site is transferred to the federal government for its use as a national parkland. Once it is transferred, the City maintains no control of any kind over the land or site. The transfer appropriates no public funds for any sectarian purpose. Moreover, the City offers no financial incentive in the donation for the federal government to either maintain or remove the cross.

 We decline to judge the validity of the transfer based on what the federal government may or may not decide to do with the cross. Following the transfer, the federal government will determine the future of the site and in making its decision has the financial capability to remove the cross if it decides it wants or needs to do so. We assume government entities will act constitutionally. (*McCreary, supra,* 545 U.S. at p. 863 [125 S.Ct. at p. 2735].)

We conclude there is no violation of article XVI, section 5 of the California Constitution.

### III

*Ownership of the Monument*

As part of its opinion the trial court states that the City agrees it does not own the improvements to the Mount Soledad site; rather, they are owned by the Association. Therefore the trial court concluded any donation to the federal government under Proposition A would appear to require concurrent donation by the Association. To clarify this part of the trial court's opinion and determine whether its holding or concerns impact the transfer mandated by Proposition A, we asked the parties to respond by letter brief to the issue of ownership and whether this court should in any manner consider the interest of the Association.

Contrary to the conclusion reached by the trial court, nowhere in the record or documents submitted at trial do we find any agreement by the City that it does not own the Mount Soledad site. At the July 13, 2005, hearing the City

indicated that, while the Association and Paulson entered into a settlement agreement following the failure of Proposition K and at the urging of the federal district court in 2004, the City did not participate in any agreement. The City stated that such an agreement would take formal approval by the city council. In response Paulson acknowledged that an agreement was sent to the City but was never signed. As explained by Paulson at the July 13, 2005, hearing, the question was whether there was a *plan* in place that the City was obligated to follow. The trial court's conclusion respecting an agreement by the City is incorrect. To the extent the trial court's opinion can be interpreted to enforce any purported plan, its decision is not supported by the record.

With respect to any actual interest the Association might have, we note that the Association appeared at trial as an invited entity, not as a party to the action, and presented its position respecting its interest in the Mount Soledad site. The City did not offer an opposing argument. However, this is not surprising given the Association's nonparty status and the fact the City was apparently not regarded as a formal party on the issue of constitutionality until the day the court's final opinion issued. The Association's position was noted but its interests in relation to those of the City were simply not litigated by the interested parties, and the trial court ultimately deferred the question to the federal court in which the question was then pending.

The parties inform us that the appeals in the federal court with respect to the issue of the Association's title and interests were, following the proceedings in the trial court here, voluntarily dismissed by both parties; leaving in place the determination that the second sale to the Association is void *ab initio*.

In summary, we conclude there is no agreement by the City that the Association owns the Mount Soledad memorial or site. We further conclude any issue of the Association's title or interest is not before us and does not impact the validity of the transfer mandated by Proposition A.

IV

*Attorney Fees and Costs*

As part of its ruling the trial court awarded Paulson attorney fees and costs in the amount of $268,541.02. It did so pursuant to Code of Civil procedure 1021.5. On appeal the City argues the trial court erred in making the award because it required the City pay the fees and costs incurred by others. In light of our reversal of the trial court's ruling, the attorney fees award is reversed as well.

## DISPOSITION

The holding of the trial court is reversed. Parties to pay their own costs on appeal.

Huffman, J., and Nares, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 21, 2007, S149386.